529 So.2d 82 (1988)
Gail O. WHITEHEAD, et vir, Plaintiffs-Appellants,
v.
FIREMAN'S FUND INSURANCE COMPANY, Intervenor-Appellant,
James R. Texada, Defendant-Appellee.
No. 87-468.
Court of Appeal of Louisiana, Third Circuit.
June 22, 1988.
Writ Denied October 14, 1988.
*83 Wm. Henry Sanders, Jena, for plaintiffs-appellants.
Provosty, Sadler, de Launay, Ronald J. Fiorenza, Alexandria, for defendant-appellee.
Bolen & Erwin, Lauren Gay Coleman, Alexandria, for intervenor-appellant.
Before DOUCET, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
We preface this opinion by pointing out to the reader that Gail O. Whitehead had two claims: one in tort and for worker's compensation benefits. In a separate opinion rendered by us in Gail O. Whitehead v. Fireman's Fund Insurance Company, 529 So.2d 88 (La.App. 3rd Cir.1988), we address Fireman's Fund's appeal of medical expenses in the amount of $15,812.74 awarded to Whitehead on a motion for partial summary judgment.
Gail O. Whitehead (hereafter Whitehead) and her husband, John Whitehead, sued James R. Texada (hereafter Texada) for injuries she received when Texada's vehicle rear-ended Whitehead's van which she was driving for her employer, Joubert Medical Transportation Service (hereafter JMTS). Texada admitted liability for the collision, and the determination of quantum was submitted to the jury. Fireman's Fund Insurance Company (hereafter Fireman's Fund) intervened, seeking reimbursement for the payment of weekly worker's compensation and medical benefits paid to Whitehead as a result of the accident, and submitted its claim for intervention to the trial judge for determination. The jury awarded Whitehead $10,500 for past physical pain and suffering, $10,500 for past mental anguish, distress and emotional disturbances, $13,000 for past medical expenses, and $4,250 for past loss of income; the jury also awarded John Whitehead $5,625 for loss of consortium. The trial judge awarded Fireman's Fund reimbursement of $17,500, but limited its recovery to the amount the jury awarded Whitehead for past medical expenses and past loss of income. Whitehead filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, but before Whitehead's motion could be ruled upon, Whitehead and Fireman's Fund moved for a devolutive appeal.
*84 Whitehead appeals the jury's damage award, contending that: 1) the trial court erred in failing to cast Texada, Inc. liable in the judgment; 2) the jury's award was inadequate; 3) the trial judge's award to Fireman's Fund erroneously included out-of-pocket expenses Whitehead paid; and, 4) the trial court erred in not granting Whitehead an expedited hearing on her motion for judgment notwithstanding the verdict, and ultimately not granting her motion for judgment notwithstanding the verdict. Fireman's Fund also appeals, joining Whitehead's argument that the jury's award was too low, and further contending that the trial judge's award to Fireman's Fund for reimbursement was incorrectly limited to Whitehead's award for past medical expenses and past loss of wages. Whitehead answered Fireman's Fund's appeal, arguing that it should share pro rata in the cost of her attorney's fees and expenses. For the following reasons we affirm.

FACTS
At 2 p.m. on September 19, 1985, Texada's brakes failed as he approached a stoplight in Alexandria, whereupon he collided with the rear-end of the JMTS van driven by Whitehead. The impact was slight.
It was undisputed that as the result of the rear-end collision Whitehead sustained a cervical strain that resolved itself without surgery between September 19, 1985, and February or March 1986. Texada admitted liability for the cervical strain, however, Texada denied liability for the tear to Whitehead's lumbar disc which ultimately required surgical intervention on June 19, 1986.

PARTY DEFENDANT
Whitehead contends that the judgment signed by the trial judge erroneously omitted Texada, Inc. as a defendant cast with liability for her damages. We disagree. From the appellate record it is clear that Whitehead did not name Texada, Inc. as a party defendant in her petition for damages.

MANIFEST ERROR
Whitehead and Fireman's Fund contend that the jury's award of damages was inadequate. They argue that since the jury made no award to Whitehead for future loss of wages or future pain and suffering, the only explanation is that it did not relate her low back injury to the accident of September 19, 1985. Texada argues that the essential question of fact presented to the jury was whether the accident was the cause of Whitehead's low back injury, and that the jury's resolution of that issue adverse to Whitehead is not manifestly erroneous. We do not find the jury verdict manifestly erroneous.
An appellate court should not disturb the trier of fact's damage award absent a determination that the fact-finder abused its discretion under the facts of the particular case. Benson v. Seagraves, 445 So.2d 187 (La.App. 3rd Cir.1984), writ denied, 447 So. 2d 1071 (La.1984). Although a defendant may admittedly be negligent, he is not liable for damages unless the negligence was the cause in fact of the particular personal injury. Connell v. Black, 260 So.2d 924 (La.App. 4th Cir.1972). In a personal injury suit the plaintiff has the burden of adequately proving a causal relationship between the accident and the injuries sustained. Richard v. Walgreen's Louisiana Co., 476 So.2d 1150 (La.App. 3rd Cir.1985). The test for whether the plaintiff has adequately provided such a causal relationship is whether the plaintiff demonstrated through medical testimony that, more probably than not, the medical treatment was necessitated by the injuries sustained in the accident. Polman v. Mohasco Corp., 371 So.2d 838 (La.App. 4th Cir.1978).
Whitehead testified that on the evening of the accident, she experienced stiffness in her neck, and that she worked the next day with pain in her neck and upper back. The following day, Whitehead was seen in the emergency room at LaSalle General Hospital by her family physician, Dr. Robert T. Kendrick, and on her own initiative began chiropractic care with Dr. Claus. Treatment by Dr. Claus consisted of adjustments, heat treatments, and electronic *85 stimulation. Dr. Claus was not called upon to testify at trial.
Dr. Kendrick testified that on the first occasion when he examined Whitehead on September 21, 1985, she was experiencing para-cervical muscle spasm, and his diagnosis was cervical strain. On October 3, 1985, Whitehead complained of pain in the upper back. On October 24, 1985, she had complaints of upper back pain, and Dr. Kendrick also noted that she had an occasional twinge of pain in the lower back. She again saw Dr. Kendrick on November 25, 1985; on this visit she told Dr. Kendrick that she had consulted a specialist and he had diagnosed her as having sustained a neck and cervical strain. Whitehead next consulted Dr. Kendrick on December 18, 1985, when she reported to him that although her neck was better, she was experiencing extreme pain between the shoulders, and she had some lower back discomfort on the left side. Dr. Kendrick last saw Whitehead on February 19, 1986, when she reported pain in the upper and lower back, shooting pain in the right hip and weakness in the knees. Dr. Kendrick's diagnosis was cervical strain and throracic pain, together with low back pain of unknown etiology.
On November 11, 1985, Dr. Raeburn C. Llewellyn, a neurological surgeon, examined Whitehead. Her predominant complaint was neck pain extending down between the shoulder blades. Dr. Llewellyn noted soreness of the major muscle group in the lower back, but the record did not show Whitehead made any complaint of low back pain. Dr. Llewellyn testified that the muscle soreness in the lower back could be related to the accident because the muscles had become sore as the result of Whitehead's restricted movement in the upper back and neck. All specific tests on the low back were normal, and his final impression on that date was that Whitehead had sustained a cervical disc injury. On that same date he admitted Whitehead to Methodist Hospital where she was treated for her neck complaints. A CAT Scan was normal, as was an EMG of her left arm; after a nine day hospital stay she was released with a diagnosis of cervical sprain. Dr. Llewellyn next saw Whitehead on February 21, 1986, when he again admitted her to the hospital for a myelogram of the low back and mid-chest. The myelogram indicated a bulging disc at L4-5 with swelling in the disc interspace. At this time Whitehead complained of low back pain, but denied any pain in the buttock or right leg. On April 28, 1986, Whitehead was again examined by Dr. Llewellyn for complaints of low back pain. His examination of the neck, shoulder and upper extremities was entirely normal, but she had severe limitation of movement at the waist and pain radiated into the right buttock and leg. Dr. Llewellyn rehospitalized Whitehead in June and a repeat CAT Scan was done of the lumbar area. This test confirmed the earlier finding of bulging of the L4-5 disc and showed further bulging at L5-S1. After conservative in-hospital therapy, Dr. Llewellyn performed surgery on June 19, 1986, which revealed an irreparable tear on the right side of the L4-5 disc, necessitating the removal of the torn disc portions. His observations of the L5-S1 disc during surgery revealed no abnormality.
Dr. Llewellyn discharged Whitehead on June 25, 1986, and saw her for post-operative care in September and December 1986. During the September visit Whitehead complained of low back pain and neck muscle tension, along with sensations of numbness and weakness in the legs. In December Whitehead still complained of low back pain, with some improvement, and limited neck spasms were noted. From Whitehead's disc surgery, Dr. Llewellyn assigned Whitehead a 7½% anatomical disability, and a 100% functional disability as to jumping, climbing, repetitive lifting of 25 pounds or more, and constant driving or riding activities.
Commencing on December 13, 1985, and continuing for 5½ months, Whitehead consulted Ronald S. Pryor, Ph.D., a clinical psychologist for severe depression and anxiety. He met with her 18 times and opined that her depression was directly related to her constant preoccupation about not knowing exactly what was wrong with her. He testified that after 6 weeks of treatment, Whitehead improved, and then on February *86 17, 1986, she was in more pain than before and she returned to her earlier depressed state. He also testified that Whitehead regularly discussed her pain, but he could not be definite on the location of the pain. It was his opinion that over the period of consultation, Whitehead's neck pain improved whereas her back pain worsened.
The other treating physician who testified was Dr. I.C. Turnley, a general practitioner, who first examined Whitehead on March 10, 1986, almost six months after the accident. Dr. Turnley testified that he saw a great deal of back pain and spasm on that first evaluation. On March 18, 1986, Dr. Turnley admitted Whitehead to LaSalle General Hospital through March 25, 1986, for physical therapy and traction. She again saw him on April 4, 1986, April 14, 1986, and April 22, 1986, at which time he tentatively diagnosed right side sciatica. He later saw Whitehead on May 2, 1986, and reviewed the myelogram performed by Dr. Llewellyn which revealed a bulge at the L4-5 level. Dr. Turnley saw her again on May 5 and May 16, 1986; at that time Whitehead had difficulty moving and experienced radiating pain into the tailbone and right leg. After Dr. Llewellyn performed surgery, Dr. Turnley saw Whitehead on July 1, and July 25, 1986; he did not find that her condition had improved and, although he deferred final judgment to Dr. Llewellyn, he opined that Whitehead may have another disc which required surgical intervention. Dr. Turnley conjectured that initially after the vehicular accident Whitehead's lumbar injury was not severe enough to cause any attention, but that the ligaments gradually gave way and developed into a protruded lumbar disc. He also testified that some patients could not explain the cause of a back problem, and agreed that a person could injure a disc without knowing it. He further agreed that most disc problems develop after injury, and except in cases of very severe trauma, most discs rupture later.
Texada offered the medical testimony of Dr. Ray J. Beurlot, an orthopaedic surgeon, Dr. Paul D. Ware, a psychiatrist/neurologist, and Mike Sheffield, a physical therapist.
Mike Sheffield first evaluated and treated Whitehead on October 14, 1985, on referral from Dr. Kendrick. He treated her cervical area and upper back daily from October 14, 1985, to November 8, 1985, and then from November 26, 1985, to February 19, 1986. Sheffield testified that Whitehead walked without problem until February when she came in limping on her right leg. In his treatment notes Sheffield noted that Whitehead denied that a recent trauma caused this limp, and stated that she just started having pain in her right leg; this was the first time in his progress notes that he had a notation that Whitehead complained of low back or leg pain. He continued to treat her lower back from March 18, 1986, to March 25, 1986.
Dr. Beurlot examined Whitehead on January 2, 1986. At that time Whitehead complained of pain in the neck, pain between the shoulder blades, and her left hip. Upon examination, Dr. Beurlot found tenderness over the left hip area. X-rays of Whitehead's lumbar spine were normal, as were objective tests for disc involvement. He did not feel that Whitehead had any significant problem with her lower back, and his final diagnosis was cervical and lumbar strain.
Dr. Ware examined Whitehead on June 2, 1986, and reviewed all the medical depositions and hospital records prior to trial. Based on the medical evidence and his examination, he opined that Whitehead's low back problems, including the L4-5 disc, were not related to the September 1985 accident. Dr. Ware based this opinion on his medical belief that any damage to a disc usually manifests itself within two to four weeks post-accident.
In connection with Whitehead's treatment and examination by the various physicians, the jury was also presented with evidence that, although she and her husband contended that she made complaints of low back pain from the time of the accident, she did not verbalize complaints of lower back pain to the various medical professionals she consulted. Two days after the accident she complained to Dr. Kendrick *87 of pain only in the neck. When she went to Dr. Claus, the chiropractor, shortly after the accident, she again only complained of pain in the neck. She also stated that in the 56 times she went to Mike Sheffield for physical therapy during the first five months after the accident, she made no mention of low back pain. Likewise, when Whitehead was examined by Dr. Passman, an orthopaedist whom she saw only once shortly after the accident, she filled out a form that stated she was having back pain, but she did not specify upper or lower back; Dr. Passman's depositional testimony was that she made no complaints of low back pain. Similarly, when she first saw Dr. Llewellyn she did not complain of low back pain, and her first hospitalization was for testing of neck and upper back pain.
When the trier of fact is presented with conflicting testimony, an appellate court should not disturb the trier of fact's reasonable evaluation of one set of witnesses as credible, and its consequent rejection of the testimony of the opposing set of witnesses; nor should the reviewing court disturb the trier of fact's reasonable factual inferences drawn from such testimony found by it to be credible. Billiot v. Bourg, 338 So.2d 1148 (La.1976). In the case sub judice the jury was properly instructed on its function, and the weight it was to accord the testimony of Whitehead's treating physicians. On the basis of the record before us, we can not say that the jury's determination of the extent of Whitehead's injuries contrary to her assertions was clearly wrong. Furthermore, based on the above analysis, the jury could have concluded that Whitehead's cervical sprain was, as found by Dr. Llewellyn, completely normal as of April 1986, that her anatomical loss resulted from her disc surgery, and that part of the medical bills were not recoverable because they were associated with the disc surgery which was not causally related to the accident of September 19, 1985. On this basis we can not say that the jury award of $21,000 for past physical pain and suffering and past mental anguish was inadequate.

JUDGMENT NOTWITHSTANDING THE VERDICT
Whitehead contends that the trial court erred in not granting her an expedited hearing on her motion for judgment notwithstanding the verdict, and ultimately in not granting her motion. We do not reach the merits of Whitehead's contention.
Whitehead filed two motions for judgment notwithstanding the verdict or, in the alternative for a new trial: one on January 14, 1987, and a second one on January 27, 1987. The judgment memorializing the jury verdict was not signed until January 26, 1987. On February 23, 1987, Whitehead devolutively appealed the final judgment prior to a hearing on her post-verdict motions. We note that the trial court was without authority to entertain the post-judgment motions after Whitehead was granted an appeal, because its jurisdiction was divested upon the granting of the order of appeal. LSA-C.C.P. Art. 2088; Johnson v. Johnson, 473 So.2d 112 (La. App. 3rd Cir.1985). Therefore, we conclude that Whitehead's post-judgment motions were waived or abandoned when, on her motion, the order of appeal was entered, and the trial court's refusal to grant her an expedited hearing on her motions is now moot. See also Mouton v. Mosley, 448 So.2d 893 (La.App. 3rd Cir.1984).[1]

WORKER'S COMPENSATION REIMBURSEMENT
Fireman's Fund contends that the trial judge's reimbursement award to it was incorrectly limited to Whitehead's award for past medical expenses and past loss of wages. We disagree, finding Brooks v. Chicola, 514 So.2d 7 (La.1987) dispositive of this issue.
In Brooks at page 13, the Louisiana Supreme Court stated:

*88 "[R]eimbursement to the compensation insurer ... must necessarily be limited only to the damage awards for loss of earnings and medical expenses. An injured worker, as any other tort victim, is entitled to his full recovery for non-economic losses. There should be no reduction in his award for the pain and suffering element simply to give a compensation insurer full reimbursement. As we stressed in Fontenot [385 So.2d 238 (La. 1980) ], the Louisiana Worker's Compensation Law only requires reimbursement to the extent that damages for lost wages and medical expenses are recovered from a third party tortfeasor. No preference is granted to the compensation intervenor over the employee's award for pain and suffering."
Therefore, we conclude that the trial judge did not err in limiting the recovery of Fireman's Fund to the award for past loss of income.

WHITEHEAD'S ENTITLEMENT TO JUDGMENT PROCEEDS
Whitehead contends in her assignments of error and her answer to the appeal that Fireman's Fund should share pro rata in her attorney's fees and the expenses of trial. We do not address this issue, concluding that it is premature.
Just prior to filing for appeal, Whitehead filed a motion for disbursement of proceeds in the trial court which specifically addressed the issues raised in this assignment of error. Although the trial court denied Whitehead's motion, we ruled on Whitehead's writ of certiorari that the trial court was not divested of jurisdiction to hear her motion, and we ordered the trial court to hear her motion for disbursement of the proceeds of the judgment which includes the items of attorney's fees and expenses of litigation. Therefore, since this matter is still pending in the trial court, it is not properly before us at this time.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed one half to plaintiffs and one half to Fireman's Fund.
AFFIRMED.
NOTES
[1] Whitehead labors under the misapprehension that she was entitled to an expedited hearing on her post-judgment motions because her appeal delays would have tolled prior to the scheduled hearing on her motions. We disagree. Under LSA-C.C.P. Art. 2087, her appellate delays were in abeyance until the trial court ruled on her alternative motion for new trial.