STOKER, Judge.
In the trial court the plaintiffs recovered personal injury damages caused by smoke filling their home as a result of sewer testing operations conducted by the defendant, the City of St. Martinville, Louisiana (City). The defendant appealed. The City undertook to test the City’s main sewer lines by injecting smoke into the system. On appeal, the City makes no issue of its failure to warn the plaintiffs of the testing operations. Rather, the City asserts that the plaintiff, Mary Jane Thomas, was at fault in maintaining her sewer lines, because if there were flaws in the plaintiff’s own sewer system leading from the main line into plaintiff’s home, then smoke would likely escape into the house.
ASSIGNMENTS OF ERROR
The defendant City assigns only two errors; (1) the failure of the trial court to find that Mary Jane Thomas was herself at fault which would require assigning a percentage of fault to her, and (2) the award of damages to each of the several plaintiffs is excessive.
COMPARATIVE FAULT
The evidence establishes that homeowners in St. Martinville are responsible for installing and maintaining sewer lines from the City’s main line into their homes. The evidence also convinces us that, if during smoke testing operations in residential areas, as were being conducted by the City in this case, smoke enters a house, such is indicative of some fault in the homeowner’s private plumbing system. Illustrative of such faults are untrapped drains, a break in a line, or a dry trap. It stands to reason that there was some fault in the sewer system serving the Thomas property.
For the reasons given above, we conclude that the trial judge erred in holding that defendant failed to prove comparative fault on the part of Mary Jane Thomas. (Only the homeowners were at fault in this case, namely, Mary Jane Thomas and her husband, Jerome Thomas, Jr. The latter asserted a loss of consortium claim in this case which the trial judge rejected on a motion for a “directed verdict”; Mr. Thomas did not appeal.)
In applying the “Watson Factors”, Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), we apportion the fault in this case to assign 95 percent to the City and 5 percent to Mrs. Thomas. Obviously, the smoke testing operation conducted by the City was certain to result in flooding the Thomas dwelling. Had the City given the plaintiffs advanced warning, their emotional distress would have been *680 minimized. Also, it is possible that some of the physical damages could have been avoided. Moreover, the technology involved is one in which the City is far more knowledgeable than the average homeowner. Although the homeowner is responsible for proper installation of his sewer system from the point where it leaves the main line, seldom do such persons possess the expertise necessary to appreciate the technology involved. If a public body chooses to utilize the smoke injection method fo.r testing its own lines, it runs the risk of subjecting some home occupants to such untoward results as occurred. Balancing the utility of the City’s objectives against the risk created by the means adopted, we conclude that the defendant City must bear almost full responsibility for the damages caused.
DAMAGES
The trial judge awarded $20,000 in general damages to Mary Jane Thomas and $2000 each to her two daughters, Jerrie Thomas and Jennifer Thomas, and to Jer-rie’s minor son, Brandon Thomas. In its formal judgment the trial court awarded damages for medical expenses without specifying the amount.
Mary Jane Thomas
We affirm the $20,000 award to Mary Jane Thomas, although we find that it is on the high side.
Mary Jane testified that she walked into her house and encountered smoke. She testified that she “went crazy” and started “hollering and screaming.” Mary Jane stated that she believed that her house was on fire and that her children were in danger. She testified that she had to wake up Jennifer, Jerrie and Brandon, and that she had difficulty waking up Jerrie and Brandon.
Mary Jane testified that after she left the house, she saw a city worker laughing, and that the city workers then told her about the smoke testing procedure. Mary Jane testified that she could not catch her breath and was throwing up.
Mary Jane went to the emergency room following the incident. She saw Dr. Kenneth Fournet, with complaints of shortness of breath, chest pains, and stomach pains. The nurse’s notes state, among other things, that Mary Jane was very anxious. Dr. Fournet testified that the physical exam revealed expiratory wheezes and evidences of bronchial spasm in both lung fields. Her carbon monoxide level was less than five percent (normal range for nonsmokers is less than two percent and for smokers is less than six percent; Mary Jane is a nonsmoker).
Dr. Fournet diagnosed Mary Jane as having smoke inhalation and hyperventilation and treated her with medication. Mary Jane saw Dr. Fournet again on February 3, at which time she asked to see a gastroen-terologist. Dr. Fournet did not see her again for these injuries.
Mary Jane saw Dr. Gerald Elias, a general practitioner, on January 30, 1988, the day after the incident. At that time, Mary Jane complained of problems with her chest and breathing. Dr. Elias stated that Mary Jane was very anxious. Dr. Elias testified that her examination was unremarkable except for tension and anxiety. He treated her with medication.
Mary Jane saw Dr. Robert Martinez, a neurologist, on March 3, 1988, complaining of headaches which started at the back of her head and neck and radiated to the front. Mary Jane told Dr. Martinez that she had experienced these headaches for about a month since the incident, and that they would persist throughout the day unless she took some sort of medication. Mary Jane also complained of nausea, impaired vision, tingling in her hands and feet, nervousness, short temper, and fatigue, among other things. Dr. Martinez testified that Mary Jane’s neurological examination on this day was normal.
Dr. Martinez also ordered various tests including an EEG, CT scan, x-rays of her neck, and an MRI, which were normal.
Dr. Martinez saw Mary Jane again on June 10, 1988 on follow up. At that time he was of the opinion that Mary Jane was having posttraumatic stress headaches. *681 Dr. Martinez confirmed a diagnosis of post-traumatic stress syndrome at that time.
Dr. Martinez continued to see Mary Jane who continued to have various complaints consistent with posttraumatic stress syndrome. Dr. Martinez treated Mary Jane with medication and recommended that she see a psychologist.
In his deposition of April 16, 1991, Dr. Martinez testified that he believed that Mary Jane was still suffering from post-traumatic stress syndrome, but that her condition had improved significantly. He believed that Mary Jane was a credible person.
Dr. Frank Friedburg, a clinical psychologist, confirmed this diagnosis of posttrau-matic stress syndrome.
Defendant points out that the evidence reveals that Mary Jane had the physical and emotional problems prior to the smoke testing incident and that she was involved in a slip and fall accident after the smoke testing incident. For these reasons defendant contends her problems are not attributable or at least wholly attributable to that incident.
The trial judge apparently found causation or at least aggravation, and we will not disturb that finding. We affirm the award of $20,000 because, although Mary Jane’s physical injuries may have been minor, she suffered posttraumatic stress disorder as a result of the incident for at least two years after the incident. Additionally, she experienced the anguish of believing that her house was on fire and that her children and grandchild and her property were in danger.
Jennifer and Jerrie Thomas
We affirm the awards of $2000 each to Jennifer and Jerrie.
Jennifer Thomas testified that as a result of the smoke, she was nauseous and her nostrils burned. She also mentioned that her head was spinning and that she was coughing following the incident. Jennifer saw Dr. Kenneth Fournet the day after the incident, complaining of problems with her stomach. Dr. Fournet testified that Jennifer’s carbon monoxide level was less than five percent. Jennifer also saw Dr. Four-net approximately one week after the incident. Apart from the carbon monoxide findings, Dr. Fournet did not make a diagnosis of injuries relating to the smoke testing incident, nor did he prescribe treatment for Jennifer in connection with this incident.
Concerning mental pain and suffering, Jennifer testified that after her mother woke her up before smoke entered the house, she dozed off and woke up again to the sound of her mother yelling “Get up. Get up. The house is on fire.” Jennifer testified that she thought the house was on fire and that from the ceiling to “mid-level”, the house was full of smoke. She stated that she was scared and shaken up following the incident. Jennifer testified that “[ajfter they told us it wasn’t a fire, it took a load off of our mind. But the fact that it was chemicals wasn’t too much help either.” She testified that she and her family were hesitant to return home following the incident; they were not sure whether it was safe to return or what kind of chemicals entered their home from smoke testing.
Jerrie Thomas testified that the smoke made her cough and made her throat tight. She stated that she was nauseated and a little dizzy. Jerrie also saw Dr. Fournet the day after the incident complaining of an irritable throat, headache, and upset stomach. Dr. Fournet testified that her pulse was noted to be rapid and that she was coughing. He also stated that Jerrie had some irritation of her right eye, bronchi (noises in the chest caused by mucous in the bronchi tree), and wheezes bilaterally. Dr. Fournet diagnosed Jerrie as having conjunctivitis (inflammation of the lining of the eye) and tracheal bronchitis. Dr. Four-net treated Jerrie with an antibiotic, bronchial dilator, cortical steroid ophthalmic drops, and Cafarate for abdominal complaints. Jerrie’s carbon monoxide level was less than five percent.
Dr. Fournet saw Jerrie again about a week later and testified that at that time Jerrie was much improved. Dr. Fournet *682 continued treating Jerrie with the antibiotic and the bronchial dilator.
Jerrie testified that when she woke up on the morning of the incident, the house was full of smoke. She stated that she thought the house was on fire. Jerrie also testified that she was scared, and Jennifer testified that Jerrie was shaken up by the incident. Jerrie stated that she was scared to go home after the incident, and that she never knew if it was going to happen again.
The trial court found that Jennifer and Jerrie sustained physical and mental pain and suffering for one week. We will not disturb this finding. We affirm the $2000 award each to Jennifer and Jerrie because, although the duration and extent of their physical injuries appear to have been minimal, Jennifer and Jerrie suffered the mental anguish of believing that their own lives, family, and property were in danger. Additionally, they experienced a continuing uncertainty and fear concerning the chemicals to which they were exposed and which entered their house.
Brandon Thomas
However, we do find the $2000 award to Brandon excessive. The record does not reveal that he suffered mental pain and suffering to the extent that Jennifer and Jerrie did, since he was only two years old at the time of the incident. It would appear that any stress he suffered was derivative of the stress suffered by those around him.
Concerning physical pain and suffering, Dr. Fournet saw Brandon the day after the accident. He was told that Brandon had been having loose bowels all day long, was coughing, and was very irritable. Dr. Fournet testified that Brandon had a red throat, enlarged tonsils, and some sounds in his chest indicating congestion. Dr. Fournet diagnosed Brandon as having nasal pharyngitis, tonsillitis, and tracheal bronchitis. He treated Brandon with antibiotics and expectorant decongestant drops. Brandon’s carbon monoxide level was less than five percent. Dr. Fournet saw Brandon about a week later at which time Brandon was much improved. Dr. Fournet continued Brandon on the antibiotics.
We find the highest amount the trial judge could have awarded Brandon was $1000.
DISPOSITION
We amend the judgment to apportion five percent fault to Mary Jane Thomas and to reduce the award to Brandon to $1000. We affirm the judgment in all other respects. Costs are assessed 5% to Mary Jane Thomas and 95% to the City.
AMENDED and AFFIRMED as AMENDED.