738 So.2d 1105 (1999)
Kendrick MORRISON, et al., Plaintiffs-Appellants,
v.
KAPPA ALPHA PSI FRATERNITY, et al., Defendants-Appellants.
No. 31805-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 1999.
Writs Denied September 24, 1999.
*1110 Due', Caballero, Price & Guidry By Randolph A. Piedrahita, Baton Rouge, Christopher L. Whittington, Counsel for Plaintiffs Kendrick, Linda & Clayton Morrison.
Cook, Yancy, King & Galloway By Sidney E. Cook, Jr., J. Todd Benson, Shreveport, Counsel for Defendants Kappa Alpha Psi Fraternity, Aetna Casualty.
Jessie Magee, Defendant, Pro Se.
Richard P. Ieyoub, Attorney General, Jerald L. Perlman, Assistant Attorney General, La. Department of Justice, Counsel for Defendant State of Louisiana.
Before BROWN, STEWART and DREW, JJ.
BROWN, J.,
This case arises out of a fraternity hazing incident at Louisiana Tech. On April 10, 1994, Kendrick Morrison, a freshman interested in membership in Kappa Alpha Psi, was physically beaten by Jessie Magee, president of the Tech Kappa chapter, during a gathering which took place in Magee's dorm room.[1] That same night, Kendrick received treatment at the Lincoln General Hospital for injuries to his head and neck and reported the incident to campus police. Following an investigation, both the university and national fraternity suspended Magee and Tech's Kappa chapter.
Kendrick and his parents, Clayton and Linda Morrison, filed suit against Kappa Alpha Psi, Inc. ("Kappa National"); its insurer, Aetna Casualty and Surety Company ("Aetna"); Jessie Magee; and the State of Louisiana Through the Board of Trustees for State Colleges and Universities ("the State").[2] The State filed cross-claims against Kappa National, Aetna and Magee.
Finding all defendants liable for Kendrick's injuries, a jury allocated fault in the following percentages: 33% to Kappa National, 33% to the State, and 34% to Magee. The jury further found that Kappa National was vicariously liable for the actions of Magee. Kendrick was awarded $6,000 in past medical expenses, $6,000 in future medical expenses, and $300,000 in general damages. The jury, however, declined to make an award to Kendrick for future lost earning capacity. As for Kendrick's parents, although finding that they had suffered a loss of consortium, the jury declined to award them any damages.
The trial court rendered judgment in accordance with the jury's verdict on September 23, 1997. Defendants filed motions for JNOV and/or new trial which were denied by the trial court. Appeals were perfected by all of the parties, urging a host of errors.

DISCUSSION

EVIDENTIARY MATTERS

Expert Testimony
Plaintiffs contend that the trial court erred in allowing the State's vocational rehabilitation expert, Dr. Richard Galloway, to testify on the issue of Kendrick's loss of earning capacity. According to plaintiffs, Dr. Galloway should not have been allowed to change his opinion on the *1111 eve of trial to the prejudice of plaintiffs based upon his review of Kendrick's grade transcript from Louisiana Tech.
Kendrick and his parents testified that it was Kendrick's lifelong dream to become a physical therapist. Dr. Paul Ware, Kendrick's treating psychiatrist, testified that it was more probable than not that as a result of the hazing, Kendrick would be unable to become a physical therapist as his grades dropped below the point required for admission to a physical therapy program. Dr. Ware did not examine Kendrick's college transcript; instead, he based his opinion upon information provided by Kendrick during his treatment. In addition to Dr. Ware's testimony, plaintiffs presented expert testimony on the amount of future income that Kendrick could have earned as a physical therapist.[3]
To counter the evidence presented by plaintiffs, the State retained Dr. Richard Galloway as its vocational rehabilitation expert. In addition to conducting an extensive interview with Kendrick, Dr. Galloway reviewed Kendrick's medical records and the depositions of Dr. Ware, Dr. Harju and Stephanie Chalfin, plaintiffs' vocational rehabilitation expert. Plaintiffs strenuously resisted the State's efforts to provide Dr. Galloway with Kendrick's grade transcript. The trial court, however, on the Friday before trial, ordered production of Kendrick's college transcript.
After reviewing the transcripts, it was Dr. Galloway's opinion that more probable than not, Kendrick would not have been able to get into physical therapy school because his grades before and after the hazing incident were inadequate. Dr. Galloway noted that Kendrick's science and math grades were consistently poor throughout his college career. Furthermore, Kendrick's transcript showed that his high school G.P.A. and grades at Tech were lower than he represented to Dr. Galloway. In fact, Dr. Galloway noted that Kendrick's grades appeared to improve after the hazing incident. Dr. Galloway noted that Dr. Ware, who had a different opinion, did not take into account Kendrick's actual scholastic performance. Dr. Galloway believed that at most, the hazing incident delayed Kendrick from obtaining his undergraduate degree. Dr. Galloway pointed out that after Kendrick transferred from Louisiana Tech to the University of Minnesota, he began pursuing a degree in Management Information Systems.
Plaintiffs objected to the testimony of Dr. Galloway, arguing that the last minute change in his testimony was untimely, unfair and prejudicial. The trial court, however, noted that plaintiffs' vocational rehabilitation expert, Stephanie Chalfin, testified that she reviewed Kendrick's transcript well in advance of trial. The court allowed plaintiffs to depose Dr. Galloway just prior to his testimony to determine the effect, if any, his review of the transcript had on his opinion. The court further afforded plaintiffs an opportunity to have their experts testify on rebuttal.
La. C.E. art. 103(A) provides that error may not be predicated upon a ruling admitting or excluding evidence unless a substantial right of the party is affected. In reviewing evidentiary decisions of the trial court, the appellate court must consider whether the particular ruling complained of was erroneous and if so, whether the error prejudiced the complainant's cause, for unless it does, reversal is not warranted. Cash v. K.C.I. Construction, Inc., 95-1083 (La.App. 5th Cir. 05/15/96), 675 So.2d 297, writ denied 96-1811 (La.10/25/96), 681 So.2d 369; Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir. 03/11/94), 633 So.2d 903, writ denied, 94-0806 (La.05/06/94), 637 So.2d 1056.
The trial court properly allowed Dr. Galloway's testimony. Plaintiffs resisted the State's efforts to provide Dr. Galloway with Kendrick's transcript, even though their vocational rehabilitation expert had a *1112 copy of the transcript. Any delay in the transcript's production or change in Dr. Galloway's opinion after his review was caused by plaintiffs. Furthermore, plaintiffs were able to cross examine Dr. Galloway and call their own experts back on rebuttal.
As for plaintiffs' request that we assess defendants with the costs of their economic experts, we note that the jury was presented with conflicting expert testimony on the issue of whether Kendrick suffered a loss of earning capacity as a result of the hazing incident. The jury's determination that Kendrick did not sustain such a loss is fully supported by the record. We therefore find no error in the trial court's refusal to assess defendants with the costs associated with Kendrick's loss of earning capacity claim.

Evidence of Hazing at Other Universities
Plaintiffs also take issue with the trial court's refusal to allow them to introduce specific instances of hazing at other universities reported to Kappa National.
Following the trial court's ruling disallowing the presentation of evidence of prior instances of hazing reported to the national fraternity, plaintiffs filed an application for a supervisory writ with this court. In granting the writ, this court ordered:
The jury may be informed that Executive Order No. 2 was issued by the national fraternity in response to reports of hazing incidents at other local chapters and that following the issuance of Executive Order No. 2 the national organization received further reports of hazing at other local chapters. This may be done by stipulation or by evidence limited to the general proposition stated above. (Emphasis added).
So instructed, the trial court properly limited plaintiffs to the presentation of non-specific testimony that hazing occurred both before and after Kappa National promulgated Executive Order No. 2. Furthermore, inasmuch as the jury imposed liability upon the national fraternity even without evidence of other incidents of hazing, plaintiffs were not prejudiced by the exclusion of this evidence.
On this same issue, Kappa National urges that they are entitled to de novo review by this court because plaintiffs inflamed the jury by repeated reference to hazing incidents at other universities, evidence which was specifically excluded by the trial court. Particularly, Kappa National finds egregious Kendrick's mother's unsolicited and unresponsive reference to a killing arising out of hazing at another university.
We have reviewed the record and have found only one such reference. The trial court, after excusing the jury, chastised Mrs. Morrison and instructed plaintiffs and their counsel that the court would not allow any further reference to specific hazing incidents at other universities. Realizing that "you can't unring a bell that has been rung," the trial court, without any objection from Kappa National's attorney, did not give a limiting instruction to the jury. Under these circumstances, we find no legal error warranting a de novo review.

COURT'S CHARGE TO JURY ON FAULT APPORTIONMENT
Plaintiffs argue that the trial court erred in allowing the jury to apportion fault to Jessie Magee, an intentional tortfeasor, and in refusing to instruct the jury on fault apportionment as set forth by the supreme court in Veazey v. Elmwood Plantation Associates Ltd., 93-2818 (La.11/30/94), 650 So.2d 712.
A divided supreme court in Veazey, supra, held that generally, negligent tortfeasors should not be allowed to reduce their fault by the intentional act of another when they had a duty to prevent such intentional conduct. Veazey involved the interpretation of La. C.C. art. 2323, Louisiana's comparative fault provision, prior to its overhaul by the legislature in 1996.
*1113 In the 1996 Extraordinary Legislative Session, the legislature amended Civil Code articles 2323 and 2324 to require that fault be allocated to all persons causing a plaintiffs injuries (La.C.C. art. 2323) and to limit liability of each wrongdoer, with certain exceptions, to their percentage of fault (La.C.C. art. 2324).[4]
In Keith v. United States Fidelity & Guaranty Company, 96-2075 (La. 05/09/97), 694 So.2d 180, the supreme court held that the 1996 revision of La. C.C. art. 2323 was procedural and to be applied retroactively.[5]
La. C.C. art. 2323 as amended by Act Three of 1996 provides in part:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability. (Emphasis added).
Given the clear pronouncement of our supreme court on this issue, we find that the trial court properly instructed the jury to compare the fault of all involved actors.

DETERMINATION AND APPORTIONMENT OF FAULT
We next turn to the propriety of the jury's conclusions regarding liability. Finding no fault on the part of Kendrick, the jury found that Magee committed an intentional tort upon Kendrick which was a legal cause of plaintiffs' damages. The jury further found that negligence on the part of both the State and Kappa National was also legal cause of plaintiffs' damages. The jury apportioned 34% fault to Magee and 33% to each the State and Kappa National. Following entry of a judgment in accordance with the jury's verdict, defendants filed motions for JNOV and/or new trial which were denied by the trial court.
On appeal, both the State and Kappa National urge that the jury erred in finding them liable for plaintiffs' injuries. Magee urges error in the jury's failure to find fault on the part of Kendrick. We will first review the jury's liability determinations, then examine the fault percentages assigned to each actor.

Liability of the State
Inherent in the jury's finding of fault on the part of the State is its determination that the State breached a duty owed to Kendrick and that this breach was a cause-in-fact and legal cause of Kendrick's *1114 injuries. Under a duty-risk analysis, all four inquiries must be affirmatively answered for a plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318; Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289 (La.1993).

Duty
We will first address the State's argument that the trial court erred in denying summary judgment on the issue of duty. The crux of the State's motion for summary judgment was that Louisiana Tech owed no duty to Kendrick, absent active negligence, to protect him from the tortious acts of fellow students. The State asserts that the doctrine of in loco parentis at the college level has been rejected by our supreme court and that a university has no duty to shield a student from his own activities which may result in harm to himself.
In denying summary judgment, the trial court found as follows:
Kappa Alpha Psi submitted a constitution to be reviewed by the University and was recognized as a fraternal organization on the Louisiana Tech University Campus in 1975. At the time of this incident, the fraternal organization was classified as a student organization and as such fell under the guise of the Division of Student Affairs and Office of Student Life. Mr. Jean Hall was the Vice-President of Student Affairs and it was the job of the Assistant Dean of Student Life, Jackson Thigpen, to work with the various student organizations. In order to participate as a recognized student organization, Kappa had to sign documents indicating that they understood the rules and the policies of the university. A file on each of the fraternal organizations is located within the Office of Student Life. Thigpen was also the IFC Advisor, or Interfraternity Council Advisor, for the University to the various fraternal organizations. In addition to the IFC Advisor, each fraternity had their own named faculty advisor. Kappa's faculty advisor on April 10, 1994 was Etienne Wizner.
A fraternal organization and its members are also subject to the University's disciplinary boards. The university issues a student handbook entitled The Code of Student Rights, Responsibilities, and Behavior to all university students. In conjunction, the University provides disciplinary boards for student grievances. The Behavioral Standards Committee, which Thigpen was a member of, handles inappropriate action by individuals and the Student Organization Committee hears disciplinary violations of the student organizations. In the student handbook there is a specific section on "Physical and/or Mental Abuse" and "Hazing" which defines the inappropriate behavior of hazing.
Prior to the incident on April 10, 1994, the university had had complaints about events of hazing and specifically the complaints concerned Kappa Alpha Psi Fraternity. In the same day, Thigpen testified that several complaints concerning Kappa and possible hazing incidents were made. On the morning of April 27th, 1993, Thigpen received an anonymous phone call and an anonymous letter both expressing concern over possible hazing occurring within the Kappa organization. The letter identified an individual, Brandon, as being seen on campus wearing a neck brace after a night out with other fraternity members. Later that same day around 3:30 p.m., Judge Wilford Carter called Thigpen to discuss his son. Judge Carter told Thigpen that his son was a football player for the University and that he had pledged Kappa but had dropped from the pledging process due to hazing incidents. Judge Carter had a special interest in his son becoming a Kappa member because he himself is an alumni (sic) of Kappa. Around 4:15 p.m. Thigpen received another call from Lynn Hill. Hill stated that she felt that a member of the Student Government Association (SGA) who she believed was *1115 going through the initiation process was being hazed by Kappa. The individual was unable to sit down and looked sickly. This person was later identified as Orlando Powell. Powell was questioned by Thigpen the next day at the SGA office concerning his involvement in Kappa and Powell denied he had any such affiliation. Thigpen again questioned Powell the following day at his office and again Powell denied he was involved in Kappa. When Thigpen was asked in his deposition if he felt that Powell was "covering stuff up," he answered he felt Powell may have been....
The State contends there was no duty owed to this particular student under these particular circumstances because no special relationship existed between Morrison and the University to warrant such a duty. Duty is a question of law.... The defendant cites Pitre as to the Louisiana Supreme Court's rejection of the concept that a university stands in loco parentis to its students and therefore no special relationship exists between the two. Pitre v. Louisiana Tech University, 95-1466, 95-1487 (La. 05/10/96), 673 So.2d 585.... This court finds that unlike sledding down a hillside as in Pitre, the pledging process to join a fraternal organization is not an activity which an adult college student would regard as hazardous. Furthermore, the administration assigned to oversee the student organizations had knowledge of prior hazing and that incoming freshman (sic) participating in the Kappa organization may also be victim to that same conduct. Not only did the administration have such knowledge, it was also aware that at least one student appeared to be willing to hide his involvement with the Kappa organization. One can only suspect this silence resulted from fear or desire to become a full member of the organization. The Court finds that because of the prior knowledge and serious nature of hazing, social policy justifies a special relationship between the University and its students in this particular instance. Therefore the court finds this special relationship creates a duty on the part of the University to Morrison. The defendant also contends the University was under no duty to monitor student organizations, citing Fox v. Board of Supervisors of Louisiana State University, 576 So.2d 978 (La.1991).... The court finds that a university with known and documented history of hazing by a fraternal organization does in fact obligate the university to monitor such further behavior by the fraternity. Hazing is not only against the university's own policy and expressly prohibited in the student handbook but it is also against the law.... Considering such prohibitions, it can not be said that the university would be second-guessing every decision that Kappa choose (sic) to make by monitoring its use of hazing. The court finds under the circumstances the University was under a duty to monitor and prevent any further prohibited hazing activity by Kappa. (Emphasis added).
In Fox, supra, our supreme court stated that, "[I]n today's society, the college student is considered an adult capable of protecting his or her own interest." However, our legislature and universities have sought to reform a hazing tradition that has too often led to tragedy. As a matter of policy, hazing has been prohibited. This is rooted in an understanding that youthful college students may be willing to submit to physical and psychological pain, ridicule and humiliation in exchange for social acceptance which comes with membership in a fraternity.
Under these circumstances, universities which allow and regulate fraternal organizations have a duty toward their students to act within reasonable bounds to protect against illegal and proscribed hazing. The issue in this case is whether a breach of this duty occurred, which is a *1116 question of fact within the domain of the jury subject to a manifest error standard of review.

Breach
Once the court finds that a duty exists, the trier of fact must decide if that duty has been violated by the defendant. Meany v. Meany, 94-0251 (La. 07/05/94), 639 So.2d 229. Generally, a party who owes a duty breaches that duty when he fails to exercise reasonable care in protecting those at risk. Dobson v. Louisiana Power & Light Company, 567 So.2d 569 (La.1990). Under traditional negligence concepts, the duty to take reasonable steps to protect against injurious consequences resulting from the risk is based on the defendant's actual or constructive knowledge. Meany, supra. As noted above, breach of duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to the facts found and the inferences drawn by the jury. Boykin v. Louisiana Transit Company, Inc., 96-1932 (La. 03/04/98), 707 So.2d 1225.
Jack Thigpen, Assistant Dean of Student Life at Tech at the time of the incident, acknowledged that hazing is dangerous and stated that his office did everything it could to stop hazing before someone got hurt. When asked about the actions of his office in response to the complaints they received in 1993 about Kappas hazing, Thigpen contended that their investigation into the matter showed the complaints to be unfounded.
Thigpen related that Michael Cooper, Kappa's president in the spring of 1993, was called into his office and that Cooper denied that his fraternity was hazing, signing an acknowledgment to that effect. Thigpen conceded, however, that he did nothing to locate "Brandon," the subject of the anonymous letter and phone call, that he did not follow up on Judge Carter's complaint regarding his son, and that it was his impression after speaking to Orlando Powell that he could have been hiding something out of peer pressure or fear of retaliation by the Kappas. Furthermore, Thigpen did not inform either campus police or the Behavioral Standards Committee, both of whom could have investigated the complaints in accordance with the provisions of the student handbook. Instead, Thigpen testified that he informed Kappa's faculty advisor, Etienne Winzer, of the allegations and left any further action to Winzer.
Thigpen testified that no one from the university informed Kappa National of the hazing complaints received by his office. In December 1993, Kappa National sent a letter and a copy of Executive Order # 2, Kappa's anti-hazing policy, to all universities with Kappa chapters. In this letter, Kappa National asked the schools to inform them of all incidents of hazing so that they could investigate and take disciplinary action. Thigpen defended Tech's failure to notify the national organization of the 1993 complaints, asserting again that they were unsubstantiated following the investigation by his office.
Jim King, Dean of Student Life in April 1994, stated that the hazing complaints received by his office in April 1993 were handled properly; according to King, their investigation into the matter revealed no "substantial evidence" of hazing. King noted that other than the 1993 complaints, the university's file on the Kappa organization contained no documented instances of hazing prior to the incident involving Kendrick in April 1994, which was promptly reported to the national organization. King emphasized that Kappa National did not inform the university that in 1988, the national organization fined and placed the Tech chapter on probation for three years and expelled or suspended three members from the fraternity for hazing.
Etienne Winzer, Kappa's faculty advisor from 1987 to 1994, testified that as a nonmember of the fraternity, he was unable to attend Kappa meetings and functions and was very limited in his knowledge of the particulars of the fraternity. Specifically, Winzer testified that he was unaware of Kappa National's requirement that each *1117 local chapter have an alumni advisor. Winzer confirmed King's testimony regarding Tech's lack of knowledge of disciplinary action taken by the national fraternity against the local Kappa chapter in 1988.
When questioned about his actions in response to the 1993 complaints of hazing, Winzer testified that he doesn't have any specific recollection of the steps he took to investigate the matter. He recalls speaking with Judge Carter and with someone from the fraternity who denied any hazing activity. Winzer acknowledged that he did not question Orlando Powell, nor did he contact anyone from the national organization. According to Winzer, as advisor, all of his dealings were strictly with the local chapter; he had no way to get in touch with anyone from the national fraternity.
The record fully supports the jury's conclusion that Louisiana Tech failed to exercise reasonable care in this case. Contrary to the State's argument, there was ample evidence from which the jury could have concluded that the university's response to and investigation of reports of Kappa hazing in 1993, the year prior to the incident involving Kendrick, were inadequate.

Cause in Fact
Cause in fact is a "but for" analysis; if the plaintiff would not have sustained the injuries but for the defendant's substandard conduct, then such conduct is a cause in fact of the plaintiff's harm. Stroik v. Ponseti, 96-2897 (La. 09/09/97), 699 So.2d 1072; Roberts v. Benoit, 605 So.2d 1032 (La.1991); Fowler v. Roberts, 556 So.2d 1 (La.1989). To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Stroik, supra; Faucheaux, supra.
Causation is a fact-specific inquiry and the issue to be resolved is whether the fact-finder's conclusion is a reasonable one. Graves v. Page, 96-2201 (La. 11/07/97), 703 So.2d 566. When multiple causes are present, a defendant's conduct is a cause in fact when it is a substantial factor generating a plaintiff's harm. Shephard on Behalf of Shephard v. Scheeler, 96-1690, 96-1720 (La. 10/21/97), 701 So.2d 1308, citing Dixie Drive It Yourself System New Orleans Company v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962).
In the instant case, the jury could have concluded that Louisiana Tech's substandard conduct was a substantial factor in causing Kendrick's harm. The university, in spite of its knowledge that members of Kappa fraternity were possibly hazing in violation of university policy and state law, did not follow its own procedures for investigating or remedying such a problem. The record supports the jury's determination that the university's failure was a precipitating or contributing factor which made it possible for Kendrick to be physically hazed by the president.

Legal Cause
The fourth inquiry, whether the university's conduct was a legal cause of Kendrick's harm, involves a determination of whether the injuries were within the contemplation of the duty set forth above. There is no rule for determining the scope of the duty; the inquiry is a question of policy as to whether the particular risk falls within the scope of the duty. Roberts, supra. Hazing as defined by the university is both illegal and against public policy. Clearly, the primary purpose for imposing upon Louisiana Tech a duty to monitor and prevent further prohibited hazing activity is to protect students interested in fraternity membership from being subjected to such hazing. The risk that a student might be injured as a result of physical hazing is clearly within the scope of protection contemplated by imposition of such a duty.

Liability of Kappa National

Independent Liability: Duty-Risk Analysis
Kappa National urges that they owed no duty to Kendrick, citing the *1118 recent First Circuit decision of Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345 (La.App. 1st Cir. 12/29/97), 706 So.2d 525.
In Walker, supra, a Southern University student and his parents brought suit against the national fraternity, regional organization and local chapter for damages resulting from hazing activities conducted by members of the local chapter. The national organization filed a motion for summary judgment which was granted by the trial court. In affirming, the First Circuit held that the national fraternity did not owe a duty to prevent the student's injuries and was not liable for the activities of the local chapter.
Walker, supra, however, is factually distinguishable from the instant case in several important aspects. In Walker, there was no evidence that the national fraternity had knowledge of prior hazings at the Southern University chapter. Therefore, there was no evidence that the national organization was aware that their anti-hazing regulations were ineffective. In the instant case, Kappa National was aware of prior hazing activity at its Tech affiliate and knew that their measures designed to protect against and prevent hazing did no such thing.
Under the particular facts and circumstances of this case, we find that Kappa National undertook a duty to regulate, protect against and prevent hazing by its collegiate chapters and thereafter failed to act reasonably to fulfill this duty. Our review of the evidence supports a finding of both a duty on the part of the national organization and a breach thereof.
Karl Nero, Kappa National's field deputy for the region including Louisiana Tech, testified that the national organization is, in a sense, responsible for all that goes on in its chapters, as it has the right to control intake, expel or suspend members, and revoke charters. According to Nero, there are over 800 local Kappa chapters with approximately 20,000 members. Nero related that Kappa National, having authority over all affiliate chapters and members, has expelled members for hazing.
According to Nero, the organization has a hierarchy of national, regional and local officers answerable to and involved in the national fraternity. For example, on the national level, Kappa has the authority to approve or revoke a local group's charter. On the province level, province polemarchs (presidents) have the authority to supervise the activities of the local chapters and administer discipline to individual chapters for rules violations. Also, there are regional officers such as Nero who are charged with the responsibility of auditing local chapters for compliance with fraternity, university and local criminal rules and regulations. Nero noted that each local chapter could enact its own by-laws so long as they did not conflict with Kappa National's rules and regulations. Also on the local level, Kappa has a system of alumni advisors who are charged with supervising the actions of individual chapters. Nero further stated that Kappa National approved university faculty advisors such as Winzer, faculty advisor to the Tech Kappa group.
Nero testified that hazing has been outlawed by Kappa since 1949. Nonetheless, the national organization promulgated Executive Order # 2 to address incidents of hazing at local chapters. A copy of this anti-hazing policy was sent to all universities with Kappa chapters. Nero further stated that following the issuance of Executive Order # 2, Kappa National received further reports of hazing at local chapters. Nero related that the national fraternity also has educational programs and conducts workshops to address the problem of hazing.
Although vehemently denying any prior instances of hazing by its chapter at Tech right up until trial, Kappa National finally admitted that it took disciplinary action in 1988 against the Tech chapter and several individual members for hazing violations. Recognizing that Kappa National was obligated to inform university administration *1119 of all incidents of hazing at the local chapter, Nero conceded that the university was not told and was unaware that the Tech chapter and several members had been sanctioned by the national organization in 1988.
The above fully supports a conclusion that Kappa National assumed a duty to regulate, protect against and prevent hazing by its collegiate chapters, particularly an affiliate such as the Tech group which the national organization had specific knowledge of engaging in hazing activity. As for breach, the ineffectiveness of the national fraternity's response to reports of hazing at its affiliate chapters is evidenced by the fact that such abuse continued even after promulgation and dissemination of Executive Order # 2.
Specifically, Kappa National did not follow its own procedures in 1988 when it was determined that members of the Tech chapter were hazing. Although the chapter was placed on probation and three members were expelled, no one at the university was notified of the 1988 incident or that disciplinary action was taken by the national fraternity, something which, when taken together with the 1993 complaints received by Tech officials, would have possibly prompted more aggressive action on the part of the university.
Additionally, there was no alumni advisor for the Tech chapter, a clear violation of fraternity regulations. Furthermore, Winzer, the faculty advisor, was unaware of the 1988 incident. It was Winzer's testimony that had he known there was a problem with Kappas hazing at Tech, he would have taken a more involved role in overseeing the chapter. In addition to failing to disclose prior hazing activity to Winzer, the national organization did nothing to facilitate Winzer's ability to actually monitor the Tech chapter. Winzer, a non-Kappa, was neither invited to nor able to attend any of the fraternity's meetings, functions or initiations, events at which hazing could possibly occur.
As noted above, Winzer was uninformed about the 1988 hazing incident and resulting disciplinary action. As for the 1993 complaints of hazing, Winzer testified that he did not inform anyone from Kappa National or the region of the suspected hazing activity. According to Winzer, he didn't know who to contact with either the national or regional organization.
The record also shows that before trial, Kappa National strenuously asserted their lack of knowledge of any prior instances of hazing by the local chapter at Tech. At the beginning of the trial, field deputy Nero denied knowledge of the 1988 incident. However, when confronted with a tape recording of an earlier conversation between Nero and Mrs. Morrison in which he admitted knowledge of the prior instance, Nero changed his story and admitted to the 1988 incident. Nero acknowledged at trial that there was an underground pledging process and that such pledging could have been stopped prior to Kendrick's injury. Kappa National had changed the pledging period to a once a year intake procedure. At the Louisiana Tech chapter, membership intake took place in the fall. Kendrick attended a formal interest meeting (smoker) in April 1994. Thereafter, he was invited to a meeting in the fraternity president's dorm room with two other freshmen. They were asked to pay dues of $450 and were told that they would be accepted into the chapter in the fall when they had the number of hours required for membership. Following the battery on Kendrick, however, Kappa National banned further membership intake at Tech.
We find sufficient evidence to support the jury's conclusion that Kappa National failed to exercise reasonable care in this case.
As for cause in fact, we find no error in the jury's determination that Kappa National's failure to regulate, protect against and prevent further hazing activity at its Louisiana Tech chapter played a substantial role in generating Kendrick's harm. We further find that the national organization's conduct was a legal cause of plaintiff's *1120 injury. It is an obvious conclusion that the risk of a student being injured as a result of hazing is within the scope of the fraternity's duty to monitor and prevent further hazing activity.

Vicarious Liability
Kappa National also contends that the jury erred in finding that they are vicariously liable for Jessie Magee's intentional acts. With this assertion we agree.
It is well-settled that a principal is not liable for the physical torts of a non-servant agent. Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748 (La.1987); Henry v. Taco Tio, Inc., 606 So.2d 1376 (La.App. 2d Cir.1992). Only when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance, which is characteristic of the relation of master and servant, does the person in whose service the act is done become subject to liability for the physical tortious conduct of the actor. Rowell, supra; Henry, supra; Schroeder v. Board of Supervisors of Louisiana State University, 94-0909, 94-0910 (La.App. 1st Cir. 03/03/95), 653 So.2d 612, writ denied, 95-1504 (La. 09/22/95), 660 So.2d 480.
Assuming arguendo the existence of an agency relationship between the national organization and Magee as president of the Tech Kappa chapter, we find no basis for holding Kappa National liable for Magee's physical torts. There is no evidence that the national fraternity exercised any control over the physical details of Magee's acts of hazing, assaulting and battering Kendrick during a secret, unscheduled, unsanctioned meeting in Magee's dorm room. Instead, the evidence shows that such criminal conduct is expressly forbidden by Kappa National. We therefore reverse the jury's finding of vicarious liability on the part of the national organization.

Apportionment of Fault
In allocating comparative fault, consideration must be directed toward the nature of each party's conduct and the extent of the causal relationship between that conduct and the damages claimed. Factors which may influence the degree of fault assignment in that assessment include: 1) whether the conduct resulted from inadvertence or involved an awareness of the danger; 2) how great a risk the conduct created; 3) the significance of what the actor sought by the conduct; 4) the capacities of the actor, whether superior or inferior; and 5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Casualty Insurance Company, 469 So.2d 967 (La.1985); Ramirez v. Ware, 28,879 (La.App.2d Cir. 09/25/96), 680 So.2d 1302.
Allocation of fault is a factual determination subject to the manifest error rule. Theriot v. Lasseigne, 93-2661 (La. 07/05/94), 640 So.2d 1305; Ramirez, supra. After the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. It is the appellate court's duty to give some deference to the trier of fact. Clement v. Frey, 95-1119, 95-1163 (La. 01/16/96), 666 So.2d 607; Ramirez, supra.
At the outset, we find, however, no manifest error in the jury's failure to assign any fault to Kendrick Morrison. Contrary to the account related by Jessie Magee, Kendrick testified that he did not consent or "volunteer" to be beaten and that he did not feel free to leave Magee's dorm room at any time during the incident. The jury implicitly chose to credit Kendrick's testimony over that of Jessie Magee, a determination fully supported by the record.
We also do not find clearly wrong the jury's apportionment of fault equally between the State, Kappa National and Magee. Without the fault of Magee, an intentional actor, there would have been no incident; however, the same would have been true had the university and Kappa National intervened to enforce their anti-hazing *1121 policies. Considering the above, we cannot say the jury was clearly wrong or manifestly erroneous.

DAMAGES

General Damages
On appeal, the State, Kappa National and Magee urge that the jury's $300,000 general damage award to Kendrick is excessive.
General damages do not have a common denominator, but are decided on a case by case basis. Coscino v. Wolfley, 96-0702 (La.App. 4th Cir. 06/04/97), 696 So.2d 257, writs denied, 97-2317, 97-2539 (La.01/09/98), 705 So.2d 1100, 1102. General damages involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms. Killough v. Bituminous Casualty Corp., 28,329 (La.App.2d Cir. 05/08/96), 674 So.2d 1091; Kessler v. Southmark Corporation, 25,941 (La. App.2d Cir. 09/21/94), 643 So.2d 345.
In assessing damages in cases of offenses, quasi-offenses and quasi-contracts, much discretion is left to the trier of fact. La. C.C. art. 2324.1. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Killough, supra. Only after such an abuse of discretion is noted will a resort to prior awards be appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id.
In the instant case, the evidence establishes that as a result of the hazing incident, Kendrick suffered bodily injuries consisting of contusions to the neck, headaches and a cervical strain. At the most, he was treated for 14 months for his physical injuries.
Kendrick also claims that he sustained mental and emotional injuries as a result of the hazing. Dr. Ware, plaintiff's treating psychiatrist, diagnosed Kendrick as suffering from an adjustment disorder with depression and opined that Kendrick's headaches were likely caused by conversion.
Dr. Ware testified that Kendrick showed great improvement once he left Louisiana Tech and that he had regained both his academic and athletic confidence at the University of Minnesota. Plaintiff himself testified at trial that he was a "new Kendrick." According to Kendrick, his move to Minnesota was largely responsible for this positive change.
Dr. Ware further testified that with the exception of an issue of trusting black males, all of Kendrick's difficulties would be resolved within six months of trial. Dr. Ware conceded, however, that plaintiff had considered himself to be an outcast among black men even before the hazing incident.
We note with interest that plaintiffs' counsel urged the jury to award Kendrick $100,000 in general damages. We find the jury's award of $300,000, three times the amount asked for by plaintiffs' attorney during closing argument, to be grossly excessive and tantamount to an imposition of punitive damages.
We must therefore determine the highest point reasonably within the jury's discretion and lower the award accordingly. After consideration of the facts and circumstances peculiar to this case and to plaintiff, we find that $40,000 is the highest amount the jury could have reasonably awarded to Kendrick for injuries which were primarily psychological and, for the most part, resolved as of trial.[6]

*1122 Future Medical Expenses

The State argues that the jury erred in awarding $6,000 to Kendrick for future medical expenses.
An award for future medical expenses is proper if the plaintiff is able to establish through medical testimony the necessity for such expenses. O'Riley v. City of Shreveport, 30,107 (La.App.2d Cir. 01/23/98), 706 So.2d 213, writ denied, 98-0752 (La. 05/01/98), 718 So.2d 418. It must be demonstrated that such outlays more probably than not will be incurred. Gladney v. May, 29,373 (La.App.2d Cir. 05/07/97), 697 So.2d 1022, writ denied, 97-2417 (La.01/09/98), 705 So.2d 1101; Phiratsamy v. Pipes, 27,209 (La.App.2d Cir. 08/23/95), 660 So.2d 172.
Dr. Ware treated plaintiff for psychological injuries caused by the hazing incident. Although he opined that most of Kendrick's problems would resolve within six months of trial, Dr. Ware noted that plaintiffs biggest problem, fear and distrust of black males, would possibly be permanent and residual. Dr. Ware confirmed that Kendrick has future appointments scheduled and noted that plaintiff's medications will need to be monitored by him.
We decline to second-guess the jury on this issue and therefore find this assignment of error meritless.

Loss of Consortium
Plaintiffs, Linda and Clayton Morrison, argue that the jury erred in failing to award them damages for loss of consortium after finding that they had in fact sustained such a loss.
Civil Code art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. Parents must prove, by a preponderance of the evidence, any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity. Bell v. USAA Casualty Ins. Co., 30,172 (La.App.2d Cir. 01/21/98), 707 So.2d 102, writs denied, 98-0712, 98-0768 (La.05/08/98), 718 So.2d 433, 434; Spears v. Jefferson Parish School Board, 94-352 (La.App. 5th Cir. 11/16/94), 646 So.2d 1104.
A child may sustain physical injury without necessarily causing his parents a loss of consortium. Bell, supra. Mental anguish suffered by the parents because of an injury to their child is not compensable in a loss of consortium claim. Spears, supra; Simpson v. State, Department of Transportation and Development, 636 So.2d 608 (La.App. 1st Cir. 1993), writs denied, 94-0042, 94-1005 (La.05/06/94), 637 So.2d 471, 472.
The only evidence on this issue consists of testimony that Clayton and Linda Morrison's relationship with their son, Kendrick, had become different. The Morrisons further testified that they were now more concerned about Kendrick's safety and that he seemed to be in a "shell." Linda also stated that her worrying had caused her to lose sleep.
As reflected by their response on the special verdict form, the jury found that the Morrisons proved that they suffered a loss of consortium as a result of the incident involving their son; as pointed out by plaintiffs, however, the jury declined to award the Morrisons anything for their loss. After reviewing the record, we find that the jury committed manifest error in determining that the Morrisons proved by a preponderance of the evidence any element of their loss of consortium claim. There was absolutely no evidence that they were dependent upon their son materially or financially, nor did they prove that they were deprived of his love, affection, *1123 society or companionship. Although their testimony would possibly support the conclusion that they suffered mental anguish as a result of Kendrick's injuries, as noted above, a claim for loss of consortium does not include mental anguish suffered as a result of physical injury to their son. See Simpson, supra. We therefore reverse the jury's finding that the Morrisons suffered a loss of consortium, thus rendering the issue of zero damages moot.

THE STATE'S CROSS-CLAIM
Finally, the State argues that the trial court erred in refusing to include in its judgment the State's cross-claim against Kappa National and Magee.
The record evidences the following. In response to plaintiffs' petition for damages, the State filed an answer and cross-claim. In paragraph 14 of the answer, the State pled the fault of Kendrick Morrison, Kappa National and Magee. In paragraph 18 of the answer, the State prayed for trial by jury. As for the cross-claim, the State named Kappa National and Magee (their original co-defendants) as defendants in cross-claim and specified, "Defendants further pray for trial by jury of all issues in this matter." (Emphasis added).
The jury order does not delineate a separation of issues for trial, nor does the record reflect any objection by the State to the jury order setting forth trial by jury on all issues. The record, however, shows the State's consent to the jury verdict form which was silent as to the cross-claim. Therefore, the jury did not decide the cross-claim, nor did the trial court recognize the cross-claim in its judgment. We note that the State did not offer any objections until the instant appeal.
La. C.C.P. art. 1735 provides in part that "in his demand, a party may specify the issues which he wishes to be tried by jury." La. C.C.P. art. 1736 adds that "the trial of all issues for which a jury trial has been requested shall be by jury unless the parties stipulate that the jury trial shall be as to certain issues only ..." Not only is there no stipulation, as noted above, the State specifically asked for trial by jury of all issues.
We find, as did the trial court, that the State waived determination of its cross-claim. As noted by the trial court:
[T]he State prayed for jury trial on all issues in the matter. The State consented to the jury form which was silent as to the cross-claim. The jury did not decide the cross-claim because the State never requested that it be submitted to the jury. If an issue of fact raised by the pleadings or the evidence is omitted, the parties waive their objection, unless the issue is raised before the jury retires. Louisiana Code of Civil Procedure Article 1812(A); Smith v. Flotation Services, Inc., 596 So.2d 343 (La.App. 3d Cir.1992). By allowing the factual issues raised by its cross-claim to be omitted from the jury's consideration, the State has waived its objection. Consequently, the Court refuses to decide the issues raised by the cross-claim of the State.
This assignment of error is without merit.

CONCLUSION
For the reasons set forth above, we reverse the finding of vicarious liability on the part of Kappa Alpha Psi, Inc., and reduce Kendrick Morrison's general damage award from $300,000 to $40,000. In all other respects the trial court's judgment is affirmed.
REVERSED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED.
STEWART, J., concurs in part and dissents in part with reasons.
STEWART, J., dissenting in part.
The majority's finding of liability on the part of Kappa National is not warranted under the evidence presented and is contrary to the recent First Circuit decision, Walker v. Phi Beta Sigma Fraternity (Rho Chapter), 96-2345 (La.App. 1t Cir. *1124 12/29/97), 706 So.2d 525, which involves substantially indistinguishable facts. As such, while concurring in all other respects, I dissent from the finding of liability on the part of Kappa National and the resulting apportionment of fault.
In Walker, supra, a university student was accepted into the Membership Intake Program of Phi Beta Sigma Fraternity and was subjected to "hazing" during the intake process. The student filed suit for damages and named Phi Beta Sigma, Inc., the National Fraternity, as a defendant. The trial court granted the National Fraternity's motion for summary judgment seeking dismissal of the claims against it. The First Circuit affirmed the trial court's judgment upon finding that the National Fraternity had no duty to prevent the student's injuries.
The evidence in Walker, supra, reflected that the National Fraternity clearly prohibited hazing activities by local chapters. Newly implemented membership intake procedures specifically prohibited hazing activities in membership selection. Materials disseminated to the chapters advised any person with knowledge of hazing activities to report such activities to the national executive director. The evidence also reflected that the National Fraternity was not in a position to control the local chapters on a day-to-day basis, inasmuch as the National Fraternity was located in the District of Columbia and the local chapter was located in Louisiana. Furthermore, the evidence reflected that the National Fraternity had no knowledge of prior hazing activities at the local chapter where the incident occurred; no member of the National Fraternity was present at any of the alleged hazing incidents; and any hazing that may have occurred was purposefully hidden from the National Fraternity.
As stated above, the facts of the present case are substantially indistinguishable from the facts in Walker, supra. The fraternities in each case are identically structured according to a three level system comprised of national, regional, and local levels. The incidents in both cases involved hazing activities associated with campus chapters at the local level of the hierarchy. Kappa National is located in Philadelphia, whereas the incident at issue occurred in Ruston. As in Walker, supra, Kappa's internal structure reflects that Kappa National is not in a position to control activities in local chapters on a daily basis. Nothing in the record suggests that Kappa National has the resources to monitor the daily activities of the over 800 local chapters, particularly in such a way as to prevent the type of hidden, unauthorized incident that occurred.
Just as the evidence in Walker, supra, established that the National Fraternity clearly prohibited hazing, the record in the instant case reveals that Kappa National clearly prohibits hazing and has done so since 1949. Hazing remained a prohibited activity at the time the incident at issue occurred. Kappa National's membership intake rules specifically prohibit hazing of potential members and provide that chapters or members shall be subject to disciplinary action if hazing occurs. Kappa National also specifically prohibited hazing in a "Pronouncement on Hazing," otherwise referred to as Executive Order # 2, which provides for expulsion from the fraternity of any member involved in hazing or underground pledging.[1] In 1993, one year prior to the incident at issue, Kappa National sent a letter to Louisiana Tech University requesting reports of all hazing incidents. Although Louisiana Tech did receive reports of hazing, these were not forwarded to Kappa National for investigation. As such, Kappa National had no notice of ongoing hazing activities at Louisiana Tech University.
The majority attempts to distinguish Walker, supra, from the present case, and thus find Kappa National liable, on the basis that the National Fraternity in Walker had no knowledge of prior hazing incidents, whereas Kappa National had knowledge of a prior hazing incident that *1125 occurred in 1988. However, this distinction does not differentiate the factual circumstances of the two cases to such an extent as to warrant a finding of liability on the part of Kappa National. When Kappa National learned of a 1988 hazing incident at Louisiana Tech University, it took appropriate disciplinary action. Kappa National received no notice of hazing activity at Louisiana Tech University after 1988, until the occurrence of the incident at issue in 1994. The occurrence of the 1988 hazing incident provides no basis for finding a duty on the part of Kappa National in this instance, which occurred six years later and involved new participants who engaged in unauthorized intake and hazing activities. Contrary to the majority's assertion that the 1988 incident would lead Kappa National to believe that its measures to prevent hazing did not work, the fact that Kappa National received no notice of hazing activity after the 1988 incident would suggest that its anti-hazing measures and the disciplinary action taken in 1988 were effective.
Furthermore, in Furek v. University of Delaware, 594 A.2d 506 (Del.1991), a case cited in Walker, supra, a national fraternal organization was found not liable for damages sustained by a pledge during a hazing incident, even though evidence indicated that the national organization had knowledge of prior hazing incidents from past years. The court in Furek referred to the fact that the national fraternity did not exercise day to day control over the local chapters.
Under the circumstances of the present case, there is no basis for finding that Kappa National had a duty to the plaintiff, a freshman who was ineligible to even pledge the fraternity at the time the incident occurred, to protect him from hazing by a fraternity member who secretly scheduled a private, unsanctioned gathering, over which Kappa National exercised no control and granted no authorization. The majority found no vicarious liability on the part of Kappa National for the actions of Jessie Magee, the fraternity member who hazed the plaintiff. The fact that Kappa National exercised no control over Magee's acts of hazing the plaintiff and the fact that Kappa National expressly prohibited hazing not only support a finding of no vicarious liability, but also support a finding of no independent liability on the part of Kappa National. To find otherwise is legally inconsistent and internally incoherent.
Finding no liability on the part of Kappa National, I would reverse the jury's verdict on the apportionment of fault as it applies to Louisiana Tech University and Jessie Magee. A correct application of the factors set forth in Watson v. State Farm, 469 So.2d 967 (La.1985), would clearly require apportionment of 80% of the liability to the intentional tortfeasor, Jessie Magee, and 20% of the liability to Louisiana Tech University.
For the reasons assigned herein, I dissent from the finding of liability on the part of Kappa National and the resulting apportionment of fault as to the other defendants. Although I concur in the reduction of damages by the majority, I would further reduce them to no more than $25,000.
*1126 
*1127 
NOTES
[1] Also present during Kendrick's hazing were two other freshmen, Mariko Billups and Patrick Adams, as well as active member Zachary Jones.
[2] Kappa's local chapter was sued but apparently never served. Also, two Tech faculty members were sued and subsequently dismissed.
[3] Dr. Melvin Harju, accepted by the court as an expert in economics, projected Kendrick's future loss of income to range from $300,000 to $1,285,570.
[4] In Act 65, the legislature amended La. C.C.P. art. 1812(C) to provide a procedural basis for implementing the changes effected by Act Three of 1996.
[5] On the other hand, in Aucoin v. State Through Department of Transportation and Development, 97-1938 (La. 04/24/98), 712 So.2d 62, the supreme court found that the 1996 revision of La. C.C. art. 2324 was not retroactive as to solidarity.

Prior to its amendment in 1996, La. C.C. art. 2324(B) provided, in pertinent part, that "[i]f liability is not solidary pursuant to Paragraph A ..., then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; ..."
[6] The following are general damage awards in cases where the bodily and/or mental injuries were similar to plaintiff's. Sims v. State Farm Automobile Insurance Co., 30,602 (La. App.2d Cir. 05/13/98), 714 So.2d 132 ($20,000); Lennard v. State Farm Mutual Automobile, 26,396 (La.App.2d Cir. 01/25/95), 649 So.2d 1114 ($15,000); Sinor v. National Casualty Co., 633 So.2d 720 (La.App. 1st Cir.1993) ($25,000); Berthelot v. Aetna Casualty & Surety Co., 623 So.2d 14 (La.App. 1st Cir.1993) ($50,000); Thomas v. City of St. Martinville, 611 So.2d 678 (La.App. 3d Cir.1992) ($20,000); Whitehead v. Fireman's Fund Insurance Co., 529 So.2d 82 (La.App. 3d Cir.1988) ($21,000).
[1] A copy of Executive Order #2 is attached as Appendix A.