IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 15, 2020

## DEAUDRIC HALMON v. LANE COLLEGE

**Appeal from the Circuit Court for Madison County**
**No. C-17-4   Donald H. Allen, Judge**

_____

**No. W2019-01224-COA-R3-CV**

_____

This case concerns alleged hazing against a student perpetrated by a college fraternity. When suit was brought by the hazed student against the college, the college sought summary judgment regarding the claims asserted against it. Summary judgment was thereafter granted to the college, and the student appealed to this Court. For the reasons that follow, we reverse in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part; Affirmed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Edmund J. Schmidt, III, Nashville, Tennessee and Douglas E. Fierberg, Traverse City, Michigan, for the appellant, DeAudric Halmon.

Charles M. Purcell and Jennifer C. Craig, Jackson, Tennessee, for the appellee, Lane College.

### OPINION

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff/Appellant DeAudric Halmon ("Mr. Halmon") filed suit against Lane College and others on January 10, 2017 in the Madison County Circuit Court, alleging he had experienced hazing at the hands of members of the Phi Beta Sigma fraternity. According to Mr. Halmon's complaint, the hazing he suffered "included, but was not limited to:  being regularly blindfolded, beaten, paddled, burned by candles, deprived of sleep, dragged on all fours by a dog collar placed around his neck, paddled in a dog position, and compelled to drink numerous concoctions, including one containing a live

fish and another possibly containing lighter fluid." Mr. Halmon alleged that he had been seriously injured as a result of this hazing and claimed to have experienced "nausea, vomiting, dehydration, and complete renal/kidney failure, all of which required . . . extensive hospitalization." Mr. Halmon further alleged that he had withdrawn from college as a result of his injuries.

As to Lane College, Mr. Halmon pursued claims of negligence and vicarious liability, the latter of which was predicated on the actions (and failures to act) of a Lane College employee, Calvin Walker ("Mr. Walker"). Mr. Walker was employed as an Area Coordinator in the housing department at Lane and also served as the faculty advisor for the Delta Epsilon chapter of Phi Beta Sigma at the college.[1] According to Mr. Halmon's complaint, Mr. Walker had failed to prevent injuries to him by failing to properly intervene in the hazing and by failing to report it. The complaint also alleged that Mr. Walker had acted in concert with other members of the fraternity who conducted the hazing. As to Lane College directly, Mr. Halmon made several assertions that the college had been negligent in the manner it had hired, supervised, and retained Mr. Walker.

Answers were subsequently filed by Lane College and Mr. Walker, and on March 21, 2019, Lane College moved for summary judgment. In addition to arguing that it did not owe Mr. Halmon any duty and suggesting that it was clear that Mr. Halmon was at least 50% or more at fault, the college submitted that it could not be vicariously liable because Mr. Walker "was acting outside the course and scope of his employment" for the college. In support of its argument that no duty existed, Lane College stated that "the alleged hazing was not foreseeable" because there was "no evidence that [it] was put on notice that the Plaintiff was being haz[ed]."

On June 17, 2019, the trial court granted summary judgment in Lane College's favor. Consistent with the argument in Lane College's summary judgment papers, the trial court held that the college could not be vicariously liable because Mr. Walker had been "acting outside th[e] course and scope of employment with the College." Further, the court ruled that the facts permitted a reasonable person to reach only one conclusion, i.e., that Mr. Halmon "was at least 50% or more at fault in this matter." The order was entered as "a full and final judgment" as it pertained to Lane College, with the trial court reciting that there was "no just reason for delay." This appeal followed.

## STANDARD OF REVIEW

In this appeal, Mr. Halmon challenges the trial court's entry of summary judgment. When a trial court's ruling on a motion for summary judgment is on appeal, our review is de novo without a presumption of correctness. *Collier v. Legends Park LP*,

---

[1] Mr. Walker is an alumnus of Lane College and, while a student there, was a member of the Delta Epsilon chapter of Phi Beta Sigma.

574 S.W.3d 356, 358 (Tenn. Ct. App. 2018). As a reviewing court, we make a fresh determination that the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Id.* Concerning the general standard governing summary judgment, the Tennessee Supreme Court has outlined it as follows:

> A trial court should grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Conversely, a trial court should not grant summary judgment when genuine issues or disputes of material fact are present. A dispute of material fact is that which "must be decided in order to resolve the substantive claim or defense at which the motion is directed."

*Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 748-49 (Tenn. 2015) (internal citations omitted). At summary judgment, a court should not weigh the evidence and determine the truth of the matter involved. *Eden W. ex rel. Evans v. Tarr*, 517 S.W.3d 691, 705 (Tenn. Ct. App. 2015).

## DISCUSSION

In reviewing the propriety of the trial court's grant of summary judgment, we turn first to a consideration of whether or not the trial court erred in dismissing Mr. Halmon's negligence claims against the college. Initially, we observe that the trial court's ruling is not exceedingly direct as to the basis for its dismissal of the negligence claims against the college. Nonetheless, we take heed of the following two statements from the court's summary judgment order which we understand to form the basis for its dismissal of Mr. Halmon's negligence claims:

> (2) After examining all the facts and proof submitted by both parties, and after considering the conclusions that can be drawn from such facts, the Court finds that such facts permit a reasonable person to reach only one conclusion, and that is that the Plaintiff, Deaudric Halmon, was at least 50% or more at fault in this matter.
>
> . . . .
>
> (4) There are no facts or evidence presented to support that Lane College had any knowledge or reason to believe or to expect that Calvin Walker was engaging in any acts of hazing towards any students.

Regarding the first of the two aforementioned statements, it is true that a plaintiff's own negligence incident to an injury can potentially present a bar to recovery for that

- 3 -

injury. Specifically, under our modified system of comparative fault, "so long as a plaintiff's negligence remains *less* than the defendant's negligence the plaintiff may recover." *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992) (emphasis added). No doubt, the trial court's finding that Mr. Halmon was at least 50% at fault fails to satisfy this standard for recovery. The question begs, of course, of whether that finding was proper at summary judgment in this case. Whereas Mr. Halmon submits that the court's finding regarding his comparative fault at summary judgment cannot stand, Lane College argues that the trial court's finding was correct. For the reasons that follow, we agree with Mr. Halmon on this issue and hold that any comparative fault finding by the trial court was premature.

We begin our analysis of this issue by acknowledging that there is no legal prohibition in granting a defendant summary judgment based on the defense of comparative fault. *See Young v. Jordan*, No. W2015-02453-COA-R9-CV, 2016 WL 5210873, at *4 (Tenn. Ct. App. Sept. 20, 2016) ("[W]e decline to carve out an exception excluding the affirmative defense of comparative fault from disposition by summary judgment."). "[I]f the moving party meets the standard set out in Tennessee Rule of Civil Procedure 56, the motion for summary judgment must be granted." *Id.* Nevertheless, it is well settled that comparative fault is typically a question for the trier of fact. *Ellington v. Jackson Bowling & Family Fun Ctr., L.L.C.*, No. W2012-00272-COA-R3-CV, 2013 WL 614502, at *10 (Tenn. Ct. App. Feb. 19, 2013) (noting that comparative fault can be a basis for summary judgment under "some circumstances"); *see also LaRue v. 1817 Lake Inc.*, 966 S.W.2d 423, 427 (Tenn. Ct. App. 1997) (noting that "comparative fault is a question of fact within the jury's province, which should not lightly be invaded by the trial court"); *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. Jan. 28, 2002) ("The task of comparing and allocating fault may be taken from the jury only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's."). Summary judgment may be granted if the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that his fault was equal to or greater than that of the defendants. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91–92 (Tenn. 2000).

Here, the trial court determined that based upon the evidence before it, a reasonable person could only conclude that Mr. Halmon was at least 50% at fault for his injuries. This conclusion appears to be predicated upon the evidence in the record which shows that Mr. Halmon knew he was going to be hit with a paddle during the pledge process with Phi Beta Sigma, that his signature was on a "Non-hazing sign-in sheet," that he continued in the pledge process despite hazing, and that he did not report any hazing. Indeed, the trial court specifically referred to such evidence in the course of its summary judgment order.

On appeal, Lane College attempts to rely on such evidence as establishing its

affirmative defense, but respectfully, we are of the opinion that the college's arguments—and the trial court's conclusion—do not appreciate the more nuanced picture that is painted by the record. As explained below, in our view, reasonable persons could indeed conclude that Mr. Halmon's fault was less than fifty percent. Moreover, whether or not he was at fault, and to what degree, should have been a question for the jury at trial.

A party's knowledge of risks and his reasonableness of conduct in confronting those risks are without question relevant to the comparative fault inquiry, *see Eaton v. McLain*, 891 S.W.2d 587, 592 (Tenn. 1994), and here, the trial court appeared to conclude—and the college argues on appeal—that Mr. Halmon openly submitted to the hazards he experienced with full knowledge. Lane College even states in its brief, for example, that the evidence demonstrated that Mr. Halmon "knew the exact nature of the risk that he faced." As is important when examining this question at summary judgment, however, we observe that there is evidence in the record suggesting to the contrary. No doubt, when viewed in the light most favorable to Mr. Halmon, there are genuine issues of fact concerning the degree to which Mr. Halmon appreciated the risks he ultimately encountered.[2]

Mr. Halmon testified in his deposition that Mr. Walker had informed him that there would not be any hazing. Despite this representation that there would be no "hazing," Mr. Halmon was aware prior to pledging with Phi Beta Sigma that he would be paddled. Yet, he asserted that he "didn't know [the] extent, how bad the paddling would be." He claimed to have been told that "it was going to be a[n] easy process" but indicated that what transpired was much more than had been conveyed:

> He said we will be taking three licks in, three licks out. He didn't say anything about taking -- well, getting whooped, getting beat. In the middle of getting three in and in the middle of getting three out, he didn't say that. But we were getting beat for at least a two-hour process, and that's more than three in and three out.

---

[2] As to one finding by the trial court in particular, we note that the court appeared to misconstrue certain deposition testimony from Mr. Halmon or otherwise errroneously make an adverse credibility determination at summary judgment. Among other things, Mr. Halmon claims to have consumed a live goldfish during the hazing process. The trial court found at summary judgment that Mr. Halmon "understood that he would have to consume [items including a goldfish]," but we note the following from Mr. Halmon's deposition testimony:

> Q: Did you know ahead of time that you would have to consume the goldfish?
>
> A: No, sir.

Mr. Halmon was clear that he had gotten "whoopings" and more than the represented "three licks in, three licks out."

When Mr. Halmon was asked in his deposition if he told anybody about the hits he received, he testified that the fraternity had informed him that the pledging process was not to be discussed. He stated that it was "just against the rituals." He further stated that he was "scared" that he would get "beat up for snitching." Ricky Moore, Mr. Halmon's college roommate, wrote in a Lane College incident form that Mr. Halmon had said that if he told someone, he would get his "ass beat by the sigs." According to the record, on occasions where Mr. Halmon expressed a desire to quit the pledging process, he was dissuaded from doing so.

In his brief, Mr. Halmon argues that the disposition by the federal district court in *Alexander v. Kappa Alpha Psi Fraternity, Inc.*, 464 F. Supp. 2d 751 (M.D. Tenn. 2006), is instructive as to the disposition that should have resulted in the trial court here. In that case, defendants moved for summary judgment, arguing that a hazed student should be denied recovery because of his own fault. *Id.* at 757. In addressing this issue, the district court ruled as follows:

> The defendants assert that Alexander's fault is equal to or greater than that of the defendants because he was warned about the "rough" nature of underground pledging and knew that he could quit the process at any time. The plaintiffs argue that Alexander was unaware of the true nature of underground pledging and had been threatened with public humiliation and punishment to the remaining pledges were he to quit.

> Courts outside of Tennessee have apportioned fault in similar cases in a variety of ways. For instance, in *Morrison,* the court upheld a jury's equal distribution of fault for a pledge's hazing-related injuries among Kappa National, the university that housed the Kappa chapter in question, and the Kappa member who inflicted the pledge's injuries. *See Morrison,* 738 So.2d at 1120. In *Furek,* the court rejected a defendant university's motion for a directed verdict on its claim that the plaintiff pledge's negligence contributed to his injuries such that he could not recover damages for injuries caused during hazing. *See Furek,* 594 A.2d at 523. Notably, neither court allocated any fault to the pledge who was hazed.

> While a definitive finding of fault is inappropriate at this stage of the proceedings, a reasonable jury could certainly label as less than fifty percent Mr. Alexander's portion of the fault for his injuries. Accordingly, summary judgment on this claim will be denied.

*Id.* (internal record references omitted).

We agree with Mr. Halmon that a summary determination of his comparative fault is similarly inappropriate here based on this record. Although Lane College emphasizes that Mr. Halmon knew in advance that he would get paddled, we again note that it is simply error to hold, as a matter of undisputed fact, that he "knew the exact nature of the risk that he faced." We have already detailed a couple of places in Mr. Halmon's deposition testimony where he expressed a lack of pre-awareness as to some of the details and true nature of the alleged hazing that would follow. Moreover, as pointed out by Mr. Halmon on appeal, there are several questions pertaining to certain other pieces of evidence relied upon by the trial court in reference to the comparative fault issue. One issue that has been the topic of some discussion relates to an anti-hazing training session allegedly held by the college. The trial court referenced such a meeting in its summary judgment order, and on appeal, Lane College argues that Mr. Halmon should have been aware of the risks of hazing based on his attendance at the session. A few points regarding this meeting are worth mentioning, however. At summary judgment, Lane College, relying on the deposition of Darryl McGee, Vice President of Student Affairs, set forth that this anti-hazing training session occurred in January 2016. Initially, we observe that Mr. McGee's testimony does not state that such a training occurred in January 2016. Although there was proof that Mr. Halmon had signed a "Non Hazing Sign In Sheet" connected to the Lane College Office of Campus Life, the only date present on that sheet was from 2015. Moreover, notwithstanding his signature on that sheet, Mr. Halmon testified that he did not remember Mr. McGee giving a presentation. Indeed, when asked if he remembered an in-service where Mr. McGee had talked about the perils of hazing, Mr. Halmon testified that he did not. There is yet another consideration complicating Lane College's assertion at summary judgment that Mr. Halmon attended anti-hazing training in January 2016, one that also complicates the alleged scope of such training. In support of the content allegedly covered at the January 2016 training session, Lane College produced evidence of a powerpoint presentation that included references to the *2017* year on a couple of slides.

As it is, based on the totality of the evidence which was presented at summary judgment, we conclude that a reasonable jury could determine that Mr. Halmon was less than 50% at fault. In connection with our conclusion on this issue, we agree with Mr. Halmon's argument on appeal that it is not abundantly clear that the trial court sufficiently considered the potential fault of other persons, that of Mr. Walker in particular. Although the college attempts to counter this concern by quoting a recital by the trial court that it had examined "all the facts and proof submitted by both parties," we are not satisfied that the potential role of all alleged tortfeasors was considered. *See Ellington*, 2013 WL 614502, at \*10 ("From our review of the written order granting summary judgment and the trial court's oral ruling, it is unclear whether the trial court considered Hawkins' proportion of fault in assessing the fault of Decedent Ellington, and if so to what extent.").

Concerning Mr. Halmon's decision to continue with the pledge process despite the

onset of hazing and his choice not to report any hazing, some evidence submitted at summary judgment provided a basis upon which a jury might conclude that Mr. Halmon had not acted wholly unreasonably in this regard. In response to Lane College's summary judgment motion, Mr. Halmon submitted the affidavit of Norman Pollard, Ed.D. ("Dr. Pollard"), who attested that he had developed a special expertise in the field of hazing and risk management. According to Dr. Pollard, hazing is often tolerated by potential new members because of a misguided assumption that the process is necessary in order to be fully accepted. He opined that there would have been great emotional consequences for Mr. Halmon to quit and report the hazing and even noted that Mr. McGee (Lane's Vice President of Student Affairs) had failed to report hazing he had experienced as a college student because he "did not want to quit." As one court has observed, "youthful college students may be willing to submit to physical and psychological pain, ridicule and humiliation in exchange for social acceptance which comes with membership in a fraternity." *Morrison v. Kappa Alpha Psi Fraternity*, 738 So. 2d 1105, 1115 (La. Ct. App. 1999). Irrespective of whether a jury might choose to assign some fault to Mr. Halmon for his failure to report his hazing, it should be little surprise to Lane College that he did not report it. According to a statement from one of its own slides from the purported January 2016 anti-hazing training session, "In 95% of cases where students identified their experience as hazing, they did not report the events to campus officials."

To summarize, although there is no question that Mr. Halmon testified that he was aware that he would be paddled as a part of the pledge process, it is not clear, as a matter of undisputed fact, that he fully appreciated or understood the whole nature of the hazing he claims to have endured. In light of this and other considerations discussed above, we are of the opinion that the trial court's apportionment of fault to Mr. Halmon was error at this stage of the proceedings. Because we conclude that reasonable minds could certainly differ as to whether Mr. Halmon was less than 50% at fault as an alleged victim of hazing, it was error for the trial court to grant summary judgment on this basis.

As noted before, it appears that the trial court's dismissal of Mr. Halmon's negligence claims against Lane College was also based on its determination that the college did not have "any knowledge or reason to believe or to expect that Calvin Walker was engaging in any acts of hazing towards any students." As best as we can understand it, it appears the trial court was perhaps intending to make a determination, albeit not explicitly, that Lane College owed no duty to Mr. Halmon. Indeed, at summary judgment, Lane College made this very argument, contending that no duty existed because hazing by Mr. Walker was "unforeseeable."

In its brief, Lane College argues that it did not owe a duty because there was "no evidence that Lane College was put on notice that the Plaintiff was being haz[ed]." Respectfully, this argument misses the mark. So too does the trial court's apparent conclusion that no duty was owed to Mr. Halmon because there was purportedly no

reason to expect that Mr. Walker would engage in any hazing. As Mr. Halmon has pointed out on appeal, the relevant question is one of foreseeability. Moreover, the foreseeability inquiry here should not have been limited to whether it was foreseeable or not whether Mr. Walker would engage in hazing. Rather, as we see it, the critical question is whether it was foreseeable that Mr. Halmon would be victimized and hazed as a pledge with Phi Beta Sigma.

Duty, which is the first element of a negligence claim, "is the legal obligation a defendant owes to a plaintiff to conform to the reasonable person standard of care in order to protect against unreasonable risks of harm." *Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012). "A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). "In essence, foreseeability is the gravamen of negligence. If the injury that occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability." *Green*, 398 S.W.3d at 177.

To the extent that the trial court concluded at summary judgment that no duty existed on the part of Lane College toward Mr. Halmon, we are of the opinion that it erred. Evidence in the record at summary judgment showed that Lane College was aware of significant risks connected to this fraternity. Mr. McGee acknowledged in his deposition that he was aware that Phi Beta Sigma, as a national fraternity generally, had hazing incidents involving death and/or serious injuries in its history, and previously, in 2012, the Lane chapter had been suspended.[3] In 2013, during the time the fraternity chapter was not recognized by Lane, the college received a phone call from a parent who alleged that her son had experienced hazing as a result of pledging Phi Beta Sigma. According to a letter chronicling this phone call, the parent alleged that her son was physically hazed on more than one occasion. Daryl Anderson, Executive Director for Phi Beta Sigma, testified by deposition that the former president of Lane College had stated to him that the chapter would not come back to Lane College as long as he was alive. However, subsequent to the death of the college's former president, an interim president of the college decided to allow the chapter to return after testifying that he prayed about the matter and used the "best logic" he could, despite not getting "any definitive answer" when he posed questions to certain people about why the chapter was not then recognized and despite not accessing records the prior president had about the fraternity.

In our view, the fact that Lane College had received a report of hazing even during

---

[3] According to certain evidence in the record, the college withdrew recognition of the chapter as a result of a planned off-campus event, which, according to a letter from the college's former president, had followed other incidents dating back to 2006.

a period when the fraternity chapter was not formally recognized should have put the college on alert for the potential for significant problems within the chapter if it was not closely monitored upon allowing it to return. Moreover, there was, in fact, an awareness among officials at the college of the dangers of hazing. For example, Fisher Smith, the Director of Campus Life, testified in her deposition that advisors like Mr. Walker were an "important part of trying to understand if what is actually happening on the ground, you know, with the intake and the pledging, that it's consistent with what's supposed to take place in the intake program."

In the previously-cited *Morrison* decision, the Court of Appeals of Louisiana addressed a university's argument following trial that a trial court had erred in denying summary judgment on the question of duty. *Morrison*, 738 So. 2d at 1114. When the trial court in that case had denied summary judgment, it held that:

> [A] university with known and documented history of hazing by a fraternal organization does in fact obligate the university to monitor such further behavior by the fraternity. Hazing is not only against the university's own policy and expressly prohibited in the student handbook but it is also against the law. . . . Considering such prohibitions, it can not be said that the university would be second-guessing every decision that Kappa [chose] to make by monitoring its use of hazing. The court finds under the circumstances the University was under a duty to monitor and prevent any further prohibited hazing activity by Kappa.

*Id.* at 1115. The appellate court did not disturb the trial court's conclusion that a duty existed, stating that "universities which allow and regulate fraternal organizations have a duty toward their students to act within reasonable bounds to protect against illegal and proscribed hazing." *Id.*

Although Lane College argues on appeal that prior incidents with the fraternity here all occurred before Mr. Walker was a member, we are not persuaded that this argument in any way compels a conclusion that no duty existed. Initially, as Mr. Halmon has aptly pointed out on appeal, we observe that there actually is a technical dispute in the record as to when Mr. Walker became a member of Phi Beta Sigma. Although Mr. Walker testified that he became a member in 2014, Mr. Anderson, the Executive Director of Phi Beta Sigma, the national fraternity, testified that Mr. Walker became a member in 2010 or 2011. In any event, the allegations here are that Mr. Halmon was harmed by those connected to the fraternity chapter as a result of hazing. Prior evidence of hazing, such as the report from 2013 when the chapter was not even then formally recognized, is therefore relevant to the duty inquiry. Indeed, the overarching foreseeability question in our view is whether it was foreseeable that new recruits to the chapter such as Mr. Halmon would be hazed by the fraternity. Again, although the trial court's summary judgment order was not specifically predicated on a determination that no duty existed,

its apparent finding in this regard is not supportable in our opinion based on the evidence adduced at summary judgment.

We next turn to the trial court's determination that Lane College could not be vicariously liable because Mr. Walker had been "acting outside th[e] course and scope of employment with the College." As this Court has previously explained, "[t]he doctrine of respondeat superior renders employers vicariously liable for the torts their employees commit while acting within the scope of their employment." *Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). "In order to hold an employer liable, the plaintiff must prove (1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." *Id.* Although the question of whether an employee was acting within the scope of his or her employment is typically a question of fact, it "can be reviewed as a question of law when the employee's acts are clearly beyond the scope of his authority." *Id.*

Here, at summary judgment, Lane College argued that the alleged intentional acts of hazing committed by Mr. Walker could not be construed to have been carried out in the course and scope of his employment. We agree with this particular argument. Vicarious liability should not be predicated in this case upon the allegations by Mr. Halmon that Mr. Walker was a direct participant in hazing. To be such a participant would clearly go beyond the scope of Mr. Walker's authority as an employee of Lane College. Hazing is prohibited at the college, and as Mr. Halmon notes in his brief, it is "undisputed that Mr. Walker recognized that his duties as faculty advisor included ensuring the Chapter was complying with Lane College's Student Code of Conduct [and] ensuring fraternity members were not hazing pledges." It is simply untenable, therefore, to conclude that it would be within the scope of Mr. Walker's employment to directly participate in any hazing. To the extent that the trial court concluded that the college cannot be vicariously liable for Mr. Walker's alleged intentional torts, we hereby affirm the decision of the trial court.

However, this does not end the inquiry of the college's potential vicarious liability. Although Lane College attempted at summary judgment to establish that Mr. Walker's alleged intentional tortious behavior was clearly beyond the scope of his authority, it did not appear to directly address other allegations against Mr. Walker, namely that he had been *negligent* by failing to intervene in, stop, or report hazing. We agree with Mr. Halmon that these allegations of Mr. Walker's negligence could serve as a predicate for imposing vicarious liability.

Preliminarily, we address a suggestion by Lane College on appeal that Mr. Walker's involvement in the fraternity membership intake process was not in furtherance of any duties to Lane College. Based on the record before us, we cannot reach this conclusion, certainly not as a matter of undisputed fact. As Mr. Halmon has pointed out

on appeal, there is evidence that Mr. Walker's appointment as a faculty advisor for the fraternity came with the specific expectation that he would monitor the pledge process. Mr. Walker testified by deposition that part of his responsibilities as faculty advisor was to make sure that students were not hazing other students to become members of Phi Beta Sigma. Moreover, whereas former faculty advisor for the chapter, Dr. Karen Chachere, testified that she had been unable to view actual membership activities "because [they] deal with their rituals," the same was not true for Mr. Walker. According to Dr. Chachere, this was a beneficial aspect of Mr. Walker's role serving as an advisor, given that he was a member of the fraternity. She agreed that he was able to see what was happening with the fraternity in a way that she had not. Mr. Walker's deposition testimony illustrated this point as well. At one point in his testimony, he agreed that he was even responsible for off-campus activities of the fraternity, stating, "Yes. Because, again, as stated earlier, I was a member of the organization, as well as advisor, and I was MIP certified." Mr. Walker agreed that because he was a member of the fraternity and he could get access to information about the intake process, it made his role as faculty advisor extremely important to make sure there was compliance with the anti-hazing rules. As faculty advisor to the fraternity chapter, Mr. Walker was no doubt expected to report any hazing, and yet, it is alleged that he did not do so. According to Mr. Halmon's roommate, when he had approached Mr. Walker and indicated that he knew about the pledging of Mr. Halmon and suggested that the fraternity "relax," Mr. Walker shied away from the question.

At one place in its summary judgment papers, Lane College argued that Mr. Walker's employment was as an Area Coordinator. Although it is not clear to us, it appears the college may perhaps have been making this point to suggest that Mr. Walker's employment was not related to any activities concerning the fraternity. Of course, as we have discussed, by dint of his employment, Mr. Walker also served as a faculty advisor for the fraternity, and inasmuch as his duties in that role included oversight of fraternity activities, his awareness of fraternity pledge matters fit within the scope of his employment. It matters not in our view that his duties came within the specific ambit of his faculty advisor position. Employees of a university may wear more than one hat. Persuasive on this point is the discussion by the Texas Supreme Court in *Bishop v. Texas A & M University*, 35 S.W.3d 605 (Tex. 2000). In that case, a student sued a university for injuries he sustained in a school play, when, in the final scene, a fellow student missed a stab pad attached to his chest and stabbed him with a knife. *Id.* at 606. At trial, the plaintiff alleged that the university was liable for the negligence of its employees, including two faculty advisors who had allegedly been negligent in not ensuring university policies were enforced. *Id.* Although a jury found against the university and in the plaintiff's favor, the matter was reversed on appeal when it was determined that the faculty advisors were volunteers for purposes of their faculty-advisor roles. *Id.* The Texas Supreme Court ultimately disagreed, however, and concluded that the advisors were employees at the time of the stabbing:

[A]lthough Drs. Curley and Lesko may have been functioning in a nonacademic capacity as faculty advisors, their responsibilities to the university remained intact. To gain university recognition, a student organization at TAMU must obtain a faculty advisor. The official student-organizations' policy and procedures manual specifies that as an advisor, a faculty member must know the rules pertaining to TAMU organizations, be aware of liability issues, and advise the organization to make reasonable and prudent decisions when planning activities. Thus, as faculty advisors, Drs. Curley and Lesko were responsible for enforcing TAMU policies and procedures.

*Id.* at 607.

Although the thrust of Lane College's summary judgment papers was devoted to arguing why Mr. Walker's alleged intentional actions were outside the scope of his employment, it argues on appeal that the alleged acts of negligence by him are also improper for imposing vicarious liability. It argues, for instance, that his "negligent acts are not distinguishable from his intentional acts," reasoning that all actions or inactions were in furtherance of intentional hazing. Lane College does not cite any authority in support of this proposition, but even assuming it were true that Mr. Walker's alleged negligence could not be divorced from his alleged intentional actions, we could not give the college's argument countenance here based on this summary judgment record. As it is, Lane College has not admitted that Mr. Walker committed any intentional torts. Its summary judgment papers related all acts of hazing as mere allegations, and moreover, in his answer and deposition, Mr. Walker denied that he had hazed Mr. Halmon. It is simply not settled as a matter of undisputed fact as to exactly what occurred, and thus, the record before us leaves open the possibility of a finding that Mr. Walker was not directly involved in the hazing alleged but was still negligent in response to what allegedly transpired. We reverse the trial court's summary judgment order to the extent it forecloses an imposition of vicarious liability based on acts of negligence by Mr. Walker.

## CONCLUSION

For the reasons stated herein, the judgment of the trial court is reversed in part, affirmed in part, and remanded for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE